Howard TALIAFERRO

v.

Don SCHIRO, et al.

John CREEL, et al.

v.

INTERNATIONAL UNION OF
OPERATING ENGINEERS,
LOCAL 406, et al.

Robert GUIDRY

v.

INTERNATIONAL UNION OF
OPERATING ENGINEERS,
LOCAL 406, et al.

Jess W. ROWSEY

v.

INTERNATIONAL UNION OF
OPERATING ENGINEERS,
LOCAL 406, et al.

Vincent REED, et al.

v.

INTERNATIONAL UNION OF
OPERATING ENGINEERS,
LOCAL 406, et al.

Craig E. EDWARDS, et al.

v.

INTERNATIONAL UNION OF
OPERATING ENGINEERS,
LOCAL 406, et al.

Civ.A. Nos. 83–0388–LC, 83–1042–LC,
83–1141–LC, 84–0650–LC, 84–0777–LC
and 84–1005–LC.

United States District Court,
W.D. Louisiana,
Lake Charles Division.

Sept. 9, 1987.

Maurice Tynes, Levingston, Tynes & Liles, Lake Charles, La., for all plaintiffs, except Creel, Hatch and Johnson.

H. Alva Brumfield, III and William P. Brumfield, Brumfield & Brumfield, Baton Rouge, La., for plaintiffs Creel, Hatch and Johnson.

Floyd J. Falcon, Jr. and Daniel L. Avant, Avant & Falcon, Baton Rouge, La., for defendants Don Schiro and Peter Babin, III.

Jerry L. Gardner, Jr., Gardner, Robein & Healey, Metairie, La., for Int'l. Union of Operating Engineers, Local 406.

Columbus J. Laird, Oakdale, La., for Columbus J. Laird.

Willard S. Carlock, Sr., Seagoville, Tex., for Willard S. Carlock, Sr.

## OPINION

VERON, District Judge.

The plaintiffs in these related civil actions are all members or former members of the International Union of Operating Engineers, Local 406 ("the Union"), seeking recovery from the Union and its officers for denial of rights guaranteed by 29 U.S.C.A. § 411(a) (1985) and for breach of the Union's duty of fair representation. In Civil Action Nos. 83–0388 and 83–1141 the plaintiffs also included a claim for unlawful discipline for exercising those rights in violation of 29 U.S.C.A. § 529 (1985). Trial was held in the related cases simultaneously. Having considered the evidence presented at trial and the applicable law, as well as the oral and written arguments of counsel, the court finds for the plaintiffs and against the defendants for the reasons assigned below.

## FINDINGS OF FACT

### A. The Defendants

The Union, a constituent division of the International Union of Operating Engineers, is an unincorporated statewide labor organization which exists to establish and maintain collective bargaining agreements with various contractors in an effort to secure favorable wages, hours, and working conditions for workers within its jurisdiction. The Union had almost 6000 members at its peak, but currently has only about 3200 members. It has six districts statewide and maintains offices in each district with central administrative offices in New Orleans. The Lake Charles District includes the Parishes of Calcasieu, Cameron, Jefferson Davis, Beauregard, Allen and part of Vernon.

Peter Babin, III currently serves as the Business Manager and Financial Secretary of the Union, having been first elected to those offices in mid–1976. As Financial Secretary Babin has the responsibility of collecting union dues and paying union bills. As Business Manager he negotiates collective bargaining agreements with contractors within the state, serves on the committee negotiating the National Pipeline Agreement, serves as a trustee of the Union's Health and Welfare Fund, and acts as a delegate to various conventions, including the AFL–CIO convention. Babin also appoints assistant business managers (also known as "business agents" or "BA's") who operate the Union on a day-to-day basis in each of the districts.

Business agents appointed by Babin are authorized to represent the Union at pre-job conferences with contractors and in disputes between contractors and the Union or its members. Business agents have authority to appoint union stewards and master mechanics who act as union representatives on the job. Finally, business agents administer the exclusive job referral system through the hiring hall.

After appointing business agents, Babin testified that he instructed them to distribute job referrals on a non-discriminatory basis and to avoid ownership of construction equipment. After several incidents of labor violence, Babin circulated to all business agents for their signature a memorandum informing them the Union would not be liable for unauthorized activity by business agents or union members.

Babin did very little to supervise his business agents, allowing them to run their respective district offices as they saw fit. Babin met with each business agent twice a year just before Executive Board meetings to discuss local problems. He had no formal procedure for evaluating a business agent's performance, relying instead upon the voting results of his bids for re-election. If the members of a particular district voted to re-elect Babin, he assumed his business agent for that district performed his duties satisfactorily. The court

finds Babin's supervision totally inadequate.

Babin's predecessor, Jack Fisk, appointed defendant Willard Carlock, Sr. Business Agent for the Lake Charles District. When Babin became Business Manager, he retained Carlock, Sr. In the midst of criminal investigations into Carlock, Sr.'s administration of the Union's Lake Charles District, Babin fired Carlock, Sr. on March 10, 1984.

Babin appointed defendant Columbus J. ("C.J.") Laird Business Agent for the Lake Charles District in 1978. Although technically he had as much authority as Carlock, Sr., Laird considered Carlock, Sr. to be his boss and followed all of Carlock, Sr.'s directions. Laird remained in office until January 15, 1985, when he resigned after the government brought an indictment against him, Carlock, Sr. and others.

In March, 1980 Babin named Don Schiro statewide Pipe Line Business Agent. Schiro represented the Union in matters involving pipe line construction projects controlled by the National Pipe Line Agreement. As part of his duties, Schiro attended pre-job conferences with contractors on pipe line projects. Although he had ultimate responsibility for appointing stewards and referring operating engineers to pipe line jobs, Schiro generally left these details to district business agents like Carlock, Sr. and Laird.

In 1980 the Union membership elected Schiro as their President. As President Schiro receives no additional compensation from the Union (other than his salary as a business agent). The President's only duty is to preside over membership meetings held periodically in the various districts statewide.

## B. Labor Climate in Southwest Louisiana

It is impossible to fully understand this case without some background knowledge of the environment within which Carlock, Sr. operated the Lake Charles District of the Union. Accordingly, upon the plaintiff's request pursuant to Fed.R.Evid. 201, the court takes judicial notice of the following facts generally known within this court's territorial jurisdiction.

Organized labor traditionally has had considerable political and economic power in Southwest Louisiana. During the OPEC nations' oil embargo of the 1970's, Louisiana's petroleum industry began to experience rapid growth which spilled over into other industries and created a high demand for labor. Local labor leaders used their control of the labor market to gain power over contractors and union employees. As labor shortages and the period's inflationary trends caused ever-increasing wages, union members perceived their local business agents as even more powerful. Political candidates recognized the considerable influence of business agents and depended upon their support for success.

Business agents continued to exercise their power virtually unheeded, creating an environment of labor unrest characterized by violence and corruption. Confrontations between the unions and contractors employing non-union labor climaxed with the "Ellender Bridge" incident of May 20, 1975 and the "Jupiter Chemical" incident of January 15, 1976. These incidents "contributed significantly to an atmosphere of violence and fear for union contractors and employees." *United States v. Carlock,* 806 F.2d 535, 539 (5th Cir.1986) *cert. denied* —— U.S. ——, 107 S.Ct. 1611, 94 L.Ed.2d 796 (1987) and —— U.S. ——, 107 S.Ct. 1613, 94 L.Ed.2d 798 (1987). Carlock, Sr. and others were indicted, tried, and acquitted in state court for their alleged roles in the Ellender Bridge incident.

Allegations of corruption within the Union continued. Eventually a United States Senate Subcommittee and the Federal Bureau of Investigation ("FBI") launched investigations which led to the grand jury indictment, trial, and convictions of Carlock, Sr., Laird, and others of violating and conspiring to violate the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C.A. § 1962(d) (1984). Carlock, Sr. was also convicted of extortion in violation of the Hobbs Act, 18 U.S.C.A. § 1951 (1984), and of demanding and receiving illegal payments from employers in violation of the

Taft-Hartley Act, 29 U.S.C.A. § 186 (1978). Additionally, Laird was convicted of one count of obstruction of justice.

During Carlock, Sr.'s term as business agent Babin occasionally received complaints from the union members concerning improprieties committed by Carlock, Sr. Babin testified that his investigations into such matters consisted of gathering all relevant facts from the person lodging the complaint, confronting Carlock, Sr. with the allegations, and receiving Carlock, Sr.'s explanation. Satisfied with the explanation, Babin would relay it to the complainant. Babin's "investigation" of a complaint meant only communicating with the subject and cause of the complaint. The court finds this totally inadequate.

## C. Hiring Hall Procedure

The Union, as the exclusive collective bargaining agent for operating engineers seeking employment within its jurisdiction, entered into several collective bargaining agreements which govern the procedures to be used in employing operating engineers. An agreement between the Union and the Lake Charles District, Associated General Contractors of Louisiana, Inc. governs the building and construction trades industry (hereinafter referred to as the "Building Trades Agreement"). A second major agreement, the National Pipe Line Agreement, covers all transportation mainline pipe line and underground cable work.

Both agreements allow signatory contractors to hire directly qualified employees in certain circumstances. The National Pipe Line Agreement permits contractors to fill up to approximately half the positions on a project with "regular employees." "Regular employees" are those regularly and customarily employed by the individual contractor whenever he has work or who have been employed by him sometime during the previous six months, and who, because of their special knowledge and experience in pipeline construction work, are considered "key men." These key men work on the "company half."

The Building Trades Agreement allows signatory contractors to recall for employment any operating engineer that contractor has employed for at least half the previous twelve months. Contractors signatory to this agreement may also hire directly key personnel, generally limited to foremen.

Laird, Schiro, and Sonny Mason, the current business agent in the Lake Charles District, never verified that individuals hired directly by contractors met the contractual requirements for direct employment, even though an operating engineer referred through the Union's hiring hall would replace any prospective employee disqualified from direct employment.

The Union furnishes all other operating engineers to pipe line and building trades contractors through an exclusive hiring hall. Both agreements establish a method for registering and ranking applicants for referral through the hiring hall. Applicants must be placed into four groups, each containing operating engineers of roughly equivalent work experience; however, the Union has always disregarded this rule, organizing the applicants into one group of journeyman operating engineers (while maintaining a separate group for oilers). Each district office maintains out-of-work lists containing names of all applicants in the order each notifies the Union he is available for work. The Union maintains separate lists for building trades projects and pipe line projects. Since March, 1984, applicants could only have their names on one of the lists at a time.

When a contractor notifies the Union that it requires an operating engineer for a specific job, the business agent must contact qualified applicants for the job until the job is filled, starting with the first name on the proper out-of-work list. When contacted an applicant may either accept or decline a referral. An applicant who accepts a referral receives a referral slip signed by the business agent and identifying the contractor, job site, job type, wage rate, and date and time the applicant is to report. Once the applicant works forty hours, the business agent removes his

name from the out-of-work list.[1] The applicant bears the responsibility of notifying the Union that he has worked over forty hours.

An applicant may decline a referral without penalty if he feels he is not qualified for the job offered. Under the provisions of the collective bargaining agreements, the business agent should move to the bottom of the out-of-work list the name of any applicant who arbitrarily refuses to accept a referral; however, Carlock, Sr. and Laird routinely allowed applicants to turn down shorter job referrals to hold out for longer, more lucrative ones.

The Union established by custom several exceptions to the general rule that job referrals are offered to applicants in the order their names appear on the out-of-work list. These exceptions are in addition to the contractors' right to hire employees directly under the circumstances discussed above.

One exception involved referral of stewards to pipeline projects and master mechanics to building trades projects. Stewards and master mechanics act as union representatives at the job site. Frequently, they are the people actually contacting the union hall for the contractor to request additional operating engineers, providing descriptions of the type of work to be performed and the expected duration of the job. On large projects, they must be versatile operators, capable of running several types of equipment, and able to fill in on a temporary basis for any operator who becomes incapacitated. They must be able to read and write so they can keep records and must have the even temperament required to work with management and resolve disputes which may arise.

Under the collective bargaining agreements, the Union has the right to designate a steward or master mechanic from the union members already referred to the project; however, Carlock, Sr., Laird and Schiro appointed stewards and master mechanics from individuals named on the out-of-work list, regardless of their position on the list. Schiro would sometimes appoint as a pipe line steward an individual who had a job on another project when the other project was nearing completion. To appoint as a steward an individual who is not even available for work when others are registered on the out-of-work lists clearly violates the Union's hiring hall procedure.

A second exception involved the referral of short-term jobs, i.e., those expected to last one to three days, based upon information provided by the contractor (or, frequently, the steward or master mechanic) requesting an operating engineer. By custom Carlock, Sr. and Laird handed these referrals to applicants present at the hall without regard to the applicants' positions on the out-of-work list. Carlock, Sr. and Laird never consulted the out-of-work lists when making these referrals, unless two or more applicants desired the same referral.

Another exception allowed Carlock, Sr. and Laird to refer without reference to the out-of-work list a temporary replacement for any operating engineer who became incapacitated or otherwise unable to perform his job.

A final "exception" resulted from a collective bargaining agreement between the Union and Dolphin Construction Co. which required the Union to refer residents of Allen Parish to Dolphin's construction project there. Consequently, Allen Parish residents received referrals to that contractor ahead of otherwise equally qualified applicants living outside that parish whose names were higher on the out-of-work list.

## D. Carlock, Sr.'s Abuse of the Hiring Hall Procedure

During the trial, Laird admitted several times that these exceptions gave Carlock, Sr. the power to enrich his allies and to starve his enemies within the Union by controlling their ability to obtain referrals for employment. After carefully considering the testimony of the witnesses, togeth-

---

1. For pipe line projects, an operating engineer's name was removed from the pipe line out-of-work list after he had worked fifty hours.

er with the pension fund records, out-of-work lists, and referral slips admitted into evidence, this court is convinced Carlock, Sr. did in fact exploit and, at times, disregard entirely the hiring hall procedures to enrich his confederates to the detriment of the plaintiffs and others.

The court finds that Carlock, Sr. used several means to provide his confederates with regular employment in return for their support during a period when jobs were in high demand and short supply. The following is a brief discussion of some of these methods Carlock, Sr. used to bypass the out-of-work list, i.e., to circumvent the general rule that applicants for employment receive referrals in the order their names appear on the out-of-work list.

First, Carlock, Sr. repeatedly appointed his confederates stewards and master mechanics although many of those appointed lacked the skills necessary to properly perform the tasks of the position and although other equally or more qualified applicants had higher positions on the out-of-work list. Laird admitted that Michael Greer, Monroe Brabham, Pete Dartez, and Linda Young could not qualify as master mechanics but received referrals as such anyway. Carlock, Sr. forced contractors to accept unqualified individuals as master mechanics by threatening work slowdowns, work stoppages, and sabotage. The court notes that one contractor, Mar-Len Construction Co. tried to send back a master mechanic (Scimemi) for nine or ten months and finally succeeded only after halting construction on its project.

Second, Carlock, Sr. bypassed the out-of-work list to favor his confederates by exploiting the exception for referral of jobs lasting one to three days. The court recognizes that as a business agent Carlock, Sr. was familiar with the labor requirements of area construction projects. Carlock, Sr. personally visited the sites, talked with contractors' representatives, and received frequent reports from his stewards and master mechanics. The court concludes that Carlock, Sr. knew certain jobs would last substantially more than three days; nevertheless, he would refer his confederates to the jobs out of turn by designating the referrals as being for short-term jobs.[2]

Next, according to Laird, one of the easiest ways to bypass the out-of-work list was to obtain employment on the company half of a pipe line project. Laird pointed out that this required the business agent's cooperation (because only persons qualified as "regular employees" of the contractor were eligible for employment on the company half). The court finds Carlock, Sr., Laird, Schiro and even Mason gave the requisite cooperation by not confirming the eligibility of operators employed on the company half.

Finally, Carlock Sr. referred his confederates to contractors out of turn by designating the referral as a recall regardless of the individual's eligibility for recall.

Carlock, Sr. kept control over union members through intimidation and threats of retaliation in the form of economic discrimination and physical injury. The court notes testimony of an incident occurring during a union meeting. A union member demanded Carlock, Sr. take action as business agent to ensure that the wage rate the member was earning be increased to union scale. A fight developed and ended when Carlock, Sr. rammed the member's head into a wall.

Carlock, Sr. further discouraged open opposition by requiring members to vote at meetings by standing. The plaintiffs testified they feared voting against Carlock, Sr. publicly because they feared Carlock, Sr.'s retaliation.

Finally, Carlock, Sr. himself kept possession or control over the out-of-work lists,[3]

---

**2.** The court notes with interest that plaintiff Jerry Hatch received some eighty-seven referrals between January 29, 1980 and April 26, 1983. Defendant's Exhibit 59. The vast majority of these were short-term jobs. An examination of these referrals and Hatch's pension fund records reveals that only one of the eighty-seven referrals contained an inaccurate estimate of job duration.

**3.** Often Carlock, Sr.'s secretaries had possession of the out-of-work lists, but would require Carlock, Sr.'s presence before allowing a member to personally examine the lists.

which made it difficult for union members to discover improper referrals. Checking one's position on the list to challenge a referral meant confronting Carlock, Sr. directly.

### E. Plaintiffs' Testimony

#### 1. Howard Taliaferro

Howard Taliaferro joined the Union July 28, 1967 and remained a member until March 31, 1983, when he was suspended for non-payment of dues. On July 21, 1983 he was expelled. As an operating engineer, Taliaferro operated bulldozers, sidebooms, and other equipment but could not operate "claws" or cranes. Taliaferro also possessed the skills required of a steward—he could read and write, could operate several types of equipment, and knew the terms of the collective bargaining agreement sufficiently to enforce them.

Taliaferro did not support Carlock, Sr. throughout the latter's career as business agent. During the 1970's Taliaferro filed several complaints over the manner in which Carlock, Sr. administered the hiring hall procedures, objecting to Carlock, Sr.'s deviations from the terms of the collective bargaining agreement. In 1977 Taliaferro refused to contribute to Babin's re-election campaign when Carlock, Sr. solicited support. Taliaferro also declined to attend a barbecue fund raiser.

Taliaferro cooperated with the FBI during its criminal investigation of Carlock, Sr. in 1983. As a result, Taliaferro received threats warning him not to talk to the FBI or anyone else.

From late 1981 Taliaferro found little employment as an operating engineer. He signed the out-of-work list December 4, 1981 and remained registered as available for work until March 15, 1982, when Laird removed Taliaferro's name after receiving information from Schiro that Taliaferro was working in Texas. In fact Taliaferro had found employment in the Dallas, Texas area, but his name should have remained on the list until April, 1982 when he first earned in excess of 50 hours working for Avery-Mayes Construction Co.

Taliaferro continued to work steadily in Texas until October of 1982. When he contacted the Union on October 12, 1982 to register as available for work, Laird incorrectly placed Taliaferro's name on only the pipe line out-of-work list rather than on both lists.

From October 12, 1982 until June, 1984 Taliaferro's name remained on the out-of-work list. During this period he applied for jobs with many union and non-union contractors and other businesses. In November of 1982 he received referrals from Local 714 in Texas for jobs lasting a total of 26.5 hours. In early 1983 he found short jobs with non-union employers, Golightly and Woodson Construction Company. The job for Woodson lasted around ten days, for which Taliaferro earned $1241. Taliaferro also declined referrals for a couple of jobs because he could not operate the equipment involved or because FBI Agent Steven Ek had advised him to do so.

While unemployed Taliaferro experienced serious financial hardships. In January, 1983 he made his last dues payment to the Union. Later that month his car was repossessed, limiting his capability to search for work.

Finally, in June, 1984 Laird referred Taliaferro to Sanders Hydrotesting Co., where he worked for 304 hours. He has not worked at the trade since, though he remains on the out-of-work list and would accept a referral if offered one for a job for which he was qualified. Taliaferro has been receiving early retirement benefits since early 1985.

#### 2. John C. Creel

John C. Creel joined the Union as a transfer from Local 675 in Florida in 1974. Creel operates various types of equipment, but primarily cranes. Finding little work, Creel withdrew from the Union in March, 1976 to practice as an electrician. At a chance meeting with Carlock, Sr. on a construction site in 1979, Creel learned that crane operators were in high demand, so he again sought admission to the Union.

Creel worked steadily from December 27, 1979 to March 9, 1982, working nearly 2000

hours in both 1980 and 1981. After March 9, 1982 Creel's fortunes changed drastically. Over the next twelve months he received eleven referrals to short jobs lasting an average of 21 hours and totalling 235 hours. Throughout this period Creel remained available for work, visiting the union hall four times a week to seek referrals.

Beginning in March of 1982 Creel complained to Carlock, Sr. and others about discrimination in the referral procedure and on one occasion presented Carlock, Sr. with a written complaint for filing with the grievance committee. Carlock, Sr. responded by tearing up the complaint and stating that he was the grievance committee. Creel also received several threats of personal injury, injury to his family, and damage to his shrimp boat.

In 1983 Creel got one job with Roy B. Paul Construction Co. and worked for 445.5 hours, earning $6865. On September 20 of that year he and another plaintiff, Truman Johnson, were injured in an automobile accident and remained unable to work until May, 1984. Since that time Creel has received one referral and worked 56 hours at the trade in May of 1986.

While searching for employment as an operating engineer Creel supplemented his income by shrimping. Creel estimated his net income from shrimping during 1984 at $7000. At present Creel practices as a real estate agent in Florida.

### 3. Jerry Hatch

Jerry Hatch, a man of fifty years and little or no formal education, first became a member of the Union in 1964. Operating heavy equipment has been the only trade he has ever known. He testified that ever since Babin and Carlock, Sr. first took office, he has opposed them because of problems they caused within the Union. Hatch refused to pay $25 per week as demanded by Carlock, Sr.'s confederates for a legal defense fund to pay legal fees generated in Carlock, Sr.'s defense against state court criminal charges. Hatch also testified that he begged Babin to take some action to bring a solution to the internal problems in the Lake Charles District. In return for his opposition Hatch received threats by phone that his family would be killed. On one occasion Hatch received a call from his daughter, who tearfully reported a threat she had just received that she and her daughter would be killed. The stress on Hatch and his family contributed to a separation and divorce from his wife this past year.

From October, 1982 to October 4, 1984 Hatch has had only one long-term job. Hatch worked for R.B. Potashnik for 438 hours from January to March, 1983. Besides the Potashnik job, Hatch did work 122.5 hours on several short jobs, the longest lasting 22.5 hours. At all other times during this period Hatch remained available for work. Hatch went to the hall five days per week seeking referrals. He declined only those referrals involving equipment he could not operate or involving jobs in the Oakdale, Louisiana area, Carlock, Sr.'s hometown.

On October 4, 1984 Hatch suffered a job-related injury and has been disabled ever since. He has been receiving disability and social security benefits, but hopes some day to have recovered sufficiently to resume working.

### 4. Truman Johnson

Truman Johnson, born February 6, 1950, had been a union member since August 12, 1973 and could operate all types of heavy equipment except large cranes. After October, 1982 Johnson's only employment was for R.B. Potashnik Construction Company, for whom he worked 709 hours between December 10, 1982 and March 23, 1983.

Johnson became disabled September 20, 1983 in an automobile accident. Except during the time he was employed by Potashnik, he spent nearly every day at the union hall seeking referrals. After the Potashnik job Johnson begged Babin to take some action to solve the problems in the Lake Charles District. Babin refused, explaining that Carlock was in charge.

Truman Johnson died on October 10, 1986. Charles Johnson, as administrator of the property of Truman Johnson's daughter, has been substituted as the proper party plaintiff.

### 5. Robert Guidry

Robert Guidry entered the Union in 1949. He operates almost all types of heavy equipment including draglines, cherrypickers, large cranes, bulldozers and sidebooms, but does not operate any hydraulic equipment. He has worked as a steward on several jobs, all before 1969.

Guidry has a long history of opposing incumbent Union officers. In 1979 Guidry expected to receive his gold union membership card in recognition of thirty years membership in the Union. As a gold card holder Guidry would have been exempt from paying dues. Instead Guidry learned he had been suspended for non-payment of dues for eight months beginning July 31, 1955, the same time he had opposed the then-current business agent's re-election. Injured on the job, Guidry could not work at the time. During the 1950's business agents customarily collected contributions from the union membership to pay the dues of ill or injured members, but no contributions were collected for Guidry.

From September, 1979 to February, 1981 Guidry worked as the steward for Parsons-Gilbane Construction Company. After learning that a union member was paying Carlock, Sr. to keep his job, Guidry accompanied the member to report this to the FBI. Soon afterwards Carlock, Sr. tried unsuccessfully to have Guidry fired from the job. Guidry received threats, both by phone at night and in person at the job site. Three union members, confederates of Carlock, Sr., threatened Guidry's life during a conversation with him on the job site and subsequently were arrested by the FBI.

Guidry appealed to Babin in New Orleans and filed a complaint against Carlock, Sr. Guidry presented his case to the Executive Board at a hearing conducted in a Baton Rouge motel room near the Baton Rouge district office of the Union. The committee, headed by Babin, dismissed Guidry's charges.

After the Parsons job ended in February, 1981, Guidry found employment with various contractors until October, 1982. From October, 1982 to August, 1983, Guidry received only one referral. On June 27, 1983 he received a referral to Ford, Bacon & Davis Construction Company and made 253.50 hours.

Tetra Enterprises, Inc., a non-union employer gave Guidry his next job in August, 1983. Guidry had been receiving extended benefits under the federal unemployment compensation plan, having exhausted his state benefits. Two days later the union began picketing this job, creating a dilemma for Guidry. If he honored the picket line, he would again be unemployed and would lose his eligibility for extended benefits because he had refused available employment. On the other hand, by crossing the picket line Guidry risked losing his union membership. Economic pressure resulting from the discrimination within the hiring hall forced Guidry to cross the picket line and continue working.

In October, 1983 the Union filed charges against Guidry for crossing the picket line. At a union meeting in Lafayette the membership present voted to revoke Guidry's membership in the Union. Before the meeting Laird telephoned Carlock, Sr.'s supporters in the Union to assure their attendance and vote against Guidry.

Guidry had only one other job during 1983. On this job Guidry earned $1594.23 working for Harmony Corporation. In 1984 Guidry entered the trucking business transporting drilling tools and supplies to oil well locations. From this venture he earned $11,615.61 in 1984, $8776.06 in 1985 and $9342.11 in 1986.

### 6. Jess Rowsey

Jess Rowsey, born March 17, 1923, has operated heavy equipment since World War II. He joined the Union November 2, 1967 and has remained a member ever since. He can operate most types of equipment used on jobs in the Lake Charles area, and is at least as qualified to be a master

mechanic as Linda Young and Willard Carlock, Jr., two of Carlock, Sr.'s confederates frequently appointed as master mechanics.

While Carlock, Sr. was business agent in Lake Charles, Rowsey never openly opposed him. In May 1979, Nathan Courville stewarded a job on which Rowsey worked. When Courville announced he was collecting $100 from each union member on the job for Carlock, Sr.'s legal defense fund, Rowsey paid almost immediately out of fear that otherwise he would be laid off. Later, Carlock, Sr. personally visited the job and warned Rowsey to keep quiet about the payment. Again to keep his job, Rowsey did as "requested."

At a union meeting in 1980 or 1981 Rowsey witnessed the explosiveness of Carlock, Sr.'s temper. Babin, Schiro, Carlock, Sr. and Laird all attended a meeting, sitting on a dais at the front of the crowd. Just before the meeting ended, J.D. Antley, a retired member of the Union, approached Carlock, Sr. and requested that his son, then an oiler, be issued an operator's book. When Carlock, Sr. refused, Antley responded that Carlock, Sr. had done the same thing before for others. Carlock, Sr. exploded, cursing Antley and physically accosting him. Union members from the crowd had to separate the two physically. Meanwhile Babin and Laird had taken no action and Schiro had only banged his gavel demanding order. Rowsey testified that the event left him shaken and fearful of Carlock, Sr.

In June, 1981, Rowsey testified in Monroe on behalf of Lamar Honey against the business agent from the Monroe district, Charles "Sub" Hayes. *See International Union of Operating Engineers, Local 406 v. N.L.R.B.*, 701 F.2d 504 (5th Cir.1983). Since then Rowsey has experienced a great deal of trouble obtaining job referrals. In August of 1981 Rowsey received referrals to Industrial Construction Co., working only two hours, and to Ford, Bacon & Davis Construction Co., working 347.5 hours there.

During 1982 Rowsey did not receive a referral until September and worked a total of 108 hours. The court notes that Rowsey was not available for work during his wife's hospitalization from March to May of 1982. In 1983 his hours increased somewhat to 229 hours. Rowsey did not work at all in 1984, 1985, or 1986 forcing him to apply for his retirement benefits in December, 1984. He received his first retirement check May, 1985.

### 7. Vincent Reed

Vincent Reed first began working out of the Union in 1959 as an oiler. In 1960 he was injured and subsequently suspended from the Union. Near the end of 1978 Reed returned to the Union to seek employment through the hall. Carlock, Sr. exchanged a referral for $350 dollars in cash, delivered personally to Carlock, Sr. alone. Reed worked for Rimmer and Garrett Construction Company from March 1979 to the end of the year. The defendants offered no reasonable explanation for this payment; therefore, the court concludes the payment was a bribe. Certainly, Reed understood it to be such.

Eventually Reed also sought membership in the Union. Reed's testimony concerning payments Carlock, Sr. demanded in return for membership and employment is somewhat confusing. It is apparent that Reed believed Carlock, Sr. demanded a series of bribes in return for membership; however, the court is satisfied that Reed's conclusions resulted from misunderstandings by both Carlock, Sr. and Reed. The court is satisfied that the facts are as follows:

In response to Reed's request for membership, Carlock, Sr. told Reed it would cost $1800. Apparently Carlock, Sr. believed Reed had been a member of the Union in 1960 and now wanted reinstatement. The $1800 represents back dues owed from 1960 to 1980. After Reed complained to Babin about Carlock, Sr.'s demand, the fact that Reed had never been a journeyman operator surfaced. Carlock, Sr. then initiated Reed as a new member, issuing him a permit until Reed paid five dollars per week for seventy-eight weeks, plus an initiation fee and a building fund charge. Upon completion of these pay-

ments in April of 1980, Reed received a membership book.

After September, 1980 Reed received only three referrals. Through the first two referrals, both in 1982, Reed obtained employment lasting 244.4 hours. Reed's last referral from the Union came in January of 1983. From January to March, 1983 Reed worked 450 hours for R.B. Potashnik Construction Company. After March 1983, Reed only received offers to run equipment he couldn't operate, to work short jobs too far out-of-town to be financially attractive, or to work jobs too short to merit leaving the top of the out-of-work list.

### 8. Gene Romero

Gene Romero entered the Union on October 26, 1972. He primarily operates rubber-tire equipment, bulldozers, and other dirt-moving equipment. Like the other plaintiffs, Romero opposed Carlock, Sr. On one occasion in 1983, a confederate of Carlock, Sr. requested that Romero contribute to Carlock, Sr.'s legal defense fund. Romero refused.

From 1979 to 1981 he worked over 2000 hours each year, but after that his hours fell sharply to 617.25 hours in 1982, 170 hours in 1983, 260 hours in 1984, and only 16 hours in 1985. When not working, Romero went to the union hall almost every day during the mornings to seek referrals.

### 9. Alton Janise

Alton Janise, born January 7, 1928, joined the Union in 1957. He has had several strokes, the first occurring in 1984. Since then he has been unable to work. His memory is very poor and he can no longer read.

Janise's pension fund records indicate that he worked the following hours:

| | Hours |
|------|--------|
| 1980 | 1795 |
| 1981 | 2146.5 |
| 1982 | 733.5 |
| 1983 | 240 |
| 1984 | 0 |
| 1985 | 0 |

### 10. Craig Edwards

Craig Edwards entered the Union March 22, 1973. He is qualified to operate almost all kinds of heavy equipment except draglines. Since January 31, 1985 he has been suspended from the Union for non-payment of dues, but he testified that he plans to pay the amount in arrears once he is financially able. In 1981 and 1982 he worked around 1100 hours. Then in 1983 his hours fell to 590.80 and in 1984 to 73.50.

Craig Edwards testified that on one occasion when he had become desperate for work, he sold Carlock, Sr. an air conditioning unit worth several thousand dollars. In return Craig Edwards received $200. and a job several days later. Craig Edward's testimony concerning this incident was supported by Roderick Edwards, Craig's brother who testified that he helped Craig deliver the air conditioner to Carlock, Sr.

In 1982 Craig Edwards received a referral to Nichols Construction Co. The job lasted 668.8 hours and carried over into April of 1983. Craig Edwards has not received any referrals through the hall since then, but did find a job with Industrial Construction Co. on his own operating a cherrypicker for 73.5 hours. He has maintained his name on the out-of-work list and has remained available for work.

### 11. Roderick Edwards

Roddy Edwards, Craig's brother, joined the Union in 1964. He operates several types of heavy equipment, including hydraulic equipment. Hostility between Roddy Edwards and Carlock, Sr. began around late 1982 or early 1983 when Roddy Edwards stopped receiving referrals. While he remained out of work, Carlock, Sr. provided his wife Beverly with referrals. As Carlock, Sr.'s "girlfriend," she sometimes had two jobs from the Union at the same time.

From May to October, 1982 Roddy Edwards worked for J.A. Jones Construction Co. He did not receive another referral from the Union from then until the time he began serving a jail sentence in mid–1985.

## 12. Cary Vaughn

Cary Vaughn joined the Union as an oiler in 1968. As noted above, the Union maintains a separate out-of-work list for oilers. In 1979 and 1980 Vaughn worked just over 1700 hours. In 1981 his hours fell to about 1000. Then in 1982 he worked only 395 hours, followed by 39 hours in 1983 and 181 in 1984.

Vaughn claims he was passed over on the out-of-work list in August of 1982. Allan Wayne Willard, who had registered as available for work on December 8, 1981, received a referral in August ahead of Vaughn who had registered November 23, 1981. But Vaughn testified that he had surgery to remove kidney stones about that time, and a notation indicating hospitalization follows his name on the August, 1982 out-of-work list. The court concludes Vaughn was not entitled to this referral because he was not available for work in August, 1982.

Around November 1, 1983 Vaughn was passed over on the out-of-work list for a referral to R.B. Potashnik Construction Co. Vaughn had registered as available for work October 31, 1982, but the referral went to Daniel Sonnier, who had signed the list April 8, 1983. The court is satisfied that Vaughn was available for work and would have accepted the referral had it been offered to him.

## CONCLUSIONS OF LAW

The plaintiffs first claim the Union breached its fiduciary duty to represent them fairly because the Union operated its hiring hall in a discriminatory fashion. The Labor Management Relations Act, 29 U.S.C.A. § 159(a) (1973), recognizes unions as exclusive bargaining agents for all persons within the bargaining unit and correlatively imposes upon the unions the duty to represent fairly the interests of each employee in the unit in dealings with the employer. *Smith v. Local No. 25, Sheet Metal Workers International Association*, 500 F.2d 741 (5th Cir.1974).

In order to fulfill its duty of fair representation, a union must enforce the provisions of a collective bargaining agreement in a non-discriminatory manner and represent all segments of the bargaining unit fairly. "A breach of the statutory duty of fair representation occurs only when a union's conduct towards a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). In the context of distributing job referrals, a breach occurs if the Union applies "arbitrary and invidious criteria in referring employees to jobs." *International Union of Operating Engineers, Local 406 v. N.L. R.B.*, 701 F.2d 504, 508 (5th Cir.1983).

The evidence in this case demonstrates that the defendants Schiro, Laird, and Carlock, Sr. manipulated the referral system to deny the plaintiffs employment opportunities while favoring supporters of the Union's officers and business agents. Because these referrals (and denials) were based on arbitrary and invidious considerations of political support or opposition, each represents a breach of the Union's duty of fair representation.

The United States Supreme Court has held that a six-month statute of limitations period applies to all duty of fair representation actions. *Del Costello v. International Brotherhood of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). Each improper referral constitutes a separate breach of the duty of fair representation and those breaches occurring more than six months prior to the institution of the suit are time-barred. *Sevako v. Anchor Motor Freight, Inc.*, 792 F.2d 570, 575 (6th Cir.1986). As this court has previously ruled, only those breaches of the duty of fair representation occurring within six months of the filing of suit are actionable.

The plaintiffs introduced testimony concerning a vast number of referrals which they claim demonstrate discriminatory distribution of referrals through the hiring hall. After studying the testimony of the witnesses and the exhibits admitted into evidence, the court is satisfied that all of the plaintiffs have proven repeated abuses of the hiring hall procedure by the Un-

ion's business agents. The plaintiffs are entitled to recover loss of wages for all breaches occurring after the date six months prior to the date each plaintiff filed suit. The essential facts of each improper referral have been compiled and placed in the Appendix.

■ The plaintiffs also have made claims under the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C.A. §§ 401 to 531 (1985). The "Bill of Rights" section of this Act guarantees union members, among other protections, equal rights to vote and otherwise participate in union deliberations, 29 U.S.C.A. § 411(a)(1) (1985), as well as the rights of free speech and assembly, 29 U.S.C.A. § 411(a)(2) (1985). Section 411(a)(5) protects union members from being disciplined without a full and fair hearing and Section 529 prohibits unions and their officers or agents from disciplining any union member for exercising his rights guaranteed by the LMRDA.

These sections were designed "to protect the rights of union members to discuss freely and criticize the management of their unions and the conduct of their officers. The purpose of these sections is to prevent union officials from using their disciplinary powers to silence criticism and punish those who dare to question and complain." *Archibald v. Local 57, International Union of Operating Engineers,* 276 F.Supp. 326, 329 (D.R.I.1967).

Manipulation of hiring hall procedures to suppress participation in union activities and opposition to union management and policies constitutes violations of § 411(a)(1) and (2). *Murphy v. International Union of Operating Engineers, Local 18,* 774 F.2d 114, 123 (6th Cir.), *cert. denied* — U.S. ——, 106 S.Ct. 1201, 89 L.Ed.2d 315 (1986). The court finds that the Union, Carlock, Sr., Laird, and Schiro, manipulated the hiring hall procedure to suppress opposition from union members, particularly the plaintiffs. The court finds further that Carlock, Sr. employed threats and intimidation to curtail the plaintiffs' exercise of their rights to freedom of speech and assembly.

Sections 411(a)(5) and 529 protect union members from unlawful discipline. A union subjects a member to "discipline" under §§ 411 and 529 "when (1) it is undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership, and (2) it directly penalizes him in a way which separates him from comparable members in good standing." *Keene v. International Union of Operating Engineers, Local 624,* 569 F.2d 1375, 1379 (5th Cir.1978).

Discrimination in job referrals constitutes discipline when used as a tool by union leaders to control union affairs in violation of a worker's membership rights. *See Vandeventer v. Local Union No. 513, International Union of Operating Engineers,* 579 F.2d 1373, 1378–79 (8th Cir.), *cert. denied.* 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978). This court has no trouble finding that the defendants violated sections 411(a)(5) and 529 by limiting the employment opportunities made available to the plaintiffs to penalize them for refusing to support the defendants and for openly opposing them.

■ Suits brought under the LMRDA are subject to a six-month limitations period. *Local 1397, United Steelworkers of America,* 748 F.2d 180 (3rd Cir.1984). As this court has already ruled, the plaintiffs may only recover for those violations of the LMRDA occurring after the date six months prior to when the plaintiffs filed suits.

■ Having found that all of the plaintiffs but Vaughn have proven breaches of the Union's duty of fair representation and violations of the LMRDA, the court must next address the remedies available to the plaintiffs. As recovery for breach of the duty of fair representation, the plaintiffs are entitled to recover their loss of wages. The LMRDA, 29 U.S.C.A. § 412 (1985) permits a court to award "such relief ... as may be appropriate." As discussed below, the court holds that in these actions appropriate relief must include, in addition to loss of wages, mental suffering, punitive

damages, and attorney's fees. Additionally, the court holds that Guidry is entitled to reinstatement of full membership in the Union upon full payment of past dues.

Each of the plaintiffs is entitled to recover his lost wages caused by the discriminatory operation of the hiring hall. The plaintiffs need not prove these amounts with mathematical certainty. *Keene v. International Union of Operating Engineers, Local 624*, 569 F.2d 1375, 1382 (5th Cir.1978). As reasonable compensation the court will award the difference between the amount each plaintiff would have earned had the hiring hall been operated in a non-discriminatory fashion less the amount each actually earned from referrals through the Union. The court calculates the former amount by multiplying the average number of hours worked by operating engineers actively seeking employment and their hourly rate of pay. The parties have stipulated that the hourly rate to be used is $13.00.

The court accepts the testimony of the defendants' expert concerning the average number of hours worked by operating engineers actively seeking employment during the years 1981–1983. In calculating the average hours worked during 1984, the court has assumed that the yearly averages continued to decrease in 1984 at the same rate as in 1982 and 1983. Accordingly, the average number of hours worked by operating engineers actively seeking employment during 1981–1984 is as follows:

### Average Hours

| | |
|---|---|
| 1981 | 1500 |
| 1982 | 879 |
| 1983 | 516 |
| 1984 | 302 |

Taliaferro has demonstrated that the hiring hall was operated in a manner which discriminated against him as early as January 5, 1982 (*See* Appendix) and continued until at least March 10, 1984 when Carlock, Sr. was fired. Taliaferro filed suit February 7, 1983 and, therefore, may recover lost wages from August 7, 1982, six months prior to the filing date, to March 10, 1984.

To calculate Taliaferro's lost wages, the court must first calculate the earnings of the average operating engineer actively seeking employment from August 7, 1982 through March 10, 1984. Such a person could expect to have worked 351.6 hours in 1982 after August 7th (146 days after August 7, 1982, divided by 365 days in 1982, multiplied by 879 hours worked in 1982 on average), 516 hours in 1983, and 58.6 hours in 1984 up to March 10th, for a total of 926 hours. His compensation for the period (at $13.00 per hour) would equal $12,038. The amount represents the income Taliaferro could expect to have earned through the Union if the hiring hall had been operated fairly. It does not include outside income he could expect to have earned during periods of being on the out-of-work list awaiting a referral.

Next the court must calculate and deduct Taliaferro's actual earnings from referrals through the Union during the same period. His pension records reflect that he worked an estimated 374.5 hours [4] in 1982 after August 7th and zero hours in 1983 and early 1984. Taliaferro's earnings from union jobs totaled $4868.50; therefore, his award for lost wages equals $7169.50.

The court notes that during 1983 Taliaferro earned $1241 from Woodson Construction Company, a non-union employer. This amount should not be deducted as mitigation of damages because it represents an amount Taliaferro probably would have earned even if the Union had operated the hiring hall properly. In such a case Taliaferro would still have been without employment through the Union for almost nine months because even without discrimination in the hiring hall, operating engineers could be expected to work an average of only 516 hours at jobs obtained through the union. During periods of unemployment, the court could reasonably expect Taliafer-

---

**4.** This number reflects an estimate of the hours worked in August after August 7th. Taliaferro's records indicate he worked 174.5 hours for the month of August. The court estimates that 135 of those were after August 7th (24 days after August 7th/31 days in August × 174.5 hours in August = 135 hours after August 7th).

ro to explore employment opportunities outside the Union.

Creel proved discrimination in the hiring hall against him as early as April 2, 1982 (*See* Appendix) and continuing until September 20, 1983 when he became unable to work as a result of an auto accident. Creel filed suit April 29, 1983 and, therefore, may recover lost wages occurring after October 29, 1982. From October 29, 1982 to September 20, 1983, the average operating engineer could be expected to work 523.5 hours and earn $6805.50 from jobs obtained through the Union. During the same period Creel actually worked an estimated 515 hours and earned $6695. His total award for lost wages equals $110.50.

Hatch is entitled to recover for lost wages accruing from October 29, 1983 (six months before he filed suit) through March 10, 1984 (the date Carlock, Sr. was fired). The average hours operating engineers actively seeking employment could expect to have worked during this period is 726. During the same period Hatch received referrals through the Union for jobs where he worked a total of only 540 hours. Hatch's lost earnings, therefore, total $2418.

Johnson, who also filed suit April 29, 1983, is entitled to recover lost wages from October 29, 1983 until September 20, 1983, the date he suffered disabling injuries in an automobile accident. During those dates the average hours worked by operating engineers seeking employment equalled 523.5 hours. Johnson, however, worked a total of 711 hours during that time; therefore, although business agents operated the hiring hall system unfairly and at times passed over Johnson when making referrals, he still received enough referrals to allow him to work more hours than average. Thus, he did not suffer any lost wages.

Guidry filed suit May 11, 1983 and may recover lost wages accruing from November 11, 1982 until March 10, 1984. Between those dates the average hours worked was 695, while Guidry actually worked only 286.5 hours on jobs to which he received referrals from the Union. His

lost wages total $5310.50. Again, his earnings from sources other than the Union do not mitigate his losses because he would have had full opportunity to work on these jobs even absent discrimination within the hiring hall procedure.

Prior to the conclusion of trial, the parties stipulated to the amount of lost wages to which the remaining plaintiffs would be entitled in the event the court ruled in their favor. Having ruled in their favor, the court will award damages for lost wages to these plaintiffs in the following amounts:

| Rowsey | $ 2000 |
| Reed | 2500 |
| Romero | 2500 |
| Janise | 1000 |
| C. Edwards | 300 |
| R. Edwards | 500 |
| Vaughn | 1000 |

In actions brought under the LMRDA, damages for emotional distress are recoverable. *Bise v. International Brotherhood of Electrical Workers, Local 1969*, 618 F.2d 1299 (9th Cir.1979), *cert. denied* 449 U.S. 904, 101 S.Ct. 279, 66 L.Ed.2d 136 (1980). But, "emotional distress, standing alone, does not constitute a sufficient basis for the awarding of damages under the [LMRDA]." *International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers & Helpers v. Rafferty*, 348 F.2d 307, 315 (9th Cir.1965). Johnson, therefore, is not entitled to an award for emotional distress because he did not prove any lost wages.

Each of the plaintiffs clearly has suffered emotional distress as a result of the actions of the defendants. Because they opposed Carlock, Sr., they lost the opportunity to provide a livelihood for themselves and their families through the Union. Most of these plaintiffs have little formal education, which limited their opportunities for alternative sources of income. These plaintiffs suffered all the humiliation and anguish associated with financial hardship.

In addition to economic discrimination and intimidation, the plaintiffs were subjected to physical intimidation by Carlock, Sr. and his confederates. They and their

families received threats of personal injury and of damage to their property. Needless to say, the defendants' actions placed the plaintiffs and their families under an enormous strain. The court has covered all of the actions of the defendants which caused this mental and emotional distress in its discussions of the plaintiffs' testimony and will not repeat it here.

After considering the mental pain and suffering of each plaintiff, the court holds each is entitled to compensation for emotional distress in the following amounts:

| | |
|---|---|
| Taliaferro | $ 20,000 |
| Creel | 5,000 |
| Hatch | 5,000 |
| Johnson | 1,000 |
| Guidry | 20,000 |
| Rowsey | 1,000 |
| Reed | 1,000 |
| Romero | 1,000 |
| Janise | 1,000 |
| Craig Edwards | 1,000 |
| Roderick Edwards | 1,000 |
| Vaughn | 1,000 |

To fashion the appropriate relief to which Guidry is entitled under the LMRDA, the court finds it necessary to order Guidry's reinstatement as a member of the Union. In *Kuebler v. Cleveland Lithographers & Photoengravers Union Local 24–P*, 473 F.2d 359 (6th Cir.1973), the court ordered the reinstatement of a union member who was expelled for attending a meeting to discuss the lack of progress in negotiations between labor and management during a strike. First, the court found that disciplining the union member violated the LMRDA because the LMRDA guarantees a union member's right to assemble. 29 U.S.C.A. § 411(a)(2) (1985). Second, the court found that the expulsion violated 29 U.S.C.A. § 411(a)(5) (1985) because the union member did not receive a full and fair hearing before an impartial tribunal. In *Kuebler* the parties who had investigated the charges against the union member composed the tribunal which decided his case.

Guidry's expulsion from the Union for crossing a Union picket line also violated the LMRDA. As recognized by the court in *Kuebler*, 29 U.S.C.A. § 411(a)(5) (1985)

entitles union members to a full and fair hearing before an impartial tribunal. Guidry was expelled by a vote of Union members present at a meeting in Lafayette called to decide Guidry's fate. This tribunal was far from fair and impartial because prior to the meeting Laird contacted those area union members he could trust to vote against Guidry and obtained their attendance at the meeting to ensure that Guidry would be expelled.

Guidry's expulsion also was a direct result of the economic discrimination directed against him by Carlock, Sr. Guidry's expulsion occurred after he crossed a picket line to work for Tetra Enterprise, Inc. in August 1983. Prior to this job Guidry had received only one job referral from the Union and had worked only 253.5 hours in 1983. Financial hardships resulting from economic discrimination forced Guidry to accept employment with a non-union employer and cross the Union's picket line. Because Guidry's expulsion resulted from the Union's violations of the LMRDA, the court believes it appropriate to require Guidry's reinstatement to full membership in the Union. The court will also issue an order prohibiting the Union from further disciplining Guidry for crossing the Union's picket line at the Tetra Enterprise, Inc. jobsite.

The court next addresses the issue of whether punitive damages should be awarded in the present case. As the defendants have repeatedly pointed out, the United States Supreme Court has announced a *per se* ban on punitive damage awards in cases based on breach of the duty of fair representation. *International Brotherhood of Electrical Workers v. Foust*, 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979). Thus, this court may not award punitive damages in this case for the defendants' violations of the duty of fair representation.

The plaintiffs in the present case have also proven violations of the LMRDA. The Supreme Court's decision in *Foust* expressly left open the question whether punitive damages were proper in LMRDA cases. *Foust*, 442 U.S. at 47 n. 9, 99 S.Ct. at 2125

n. 9. The United States Court of Appeals for the Fifth Circuit has held both before and after *Foust* that punitive damages may be awarded under the LMRDA where the union acted with "actual malice or reckless or wanton indifference to the rights of the plaintiff." *International Brotherhood of Boilermakers v. Braswell*, 388 F.2d 193, 199 (5th Cir.) *cert. denied* 391 U.S. 935, 88 S.Ct. 1848, 20 L.Ed.2d 854 (1968); *Parker v. Local Union No. 1466, United Steelworkers of America*, 642 F.2d 104, 106 (5th Cir.1981).

The plaintiffs have shown they are entitled to punitive damages in the present case. The evidence is clear that Carlock, Sr. acted with actual malice in violating the plaintiffs' rights secured by the LMRDA. Babin and Laird demonstrated their wanton indifference to the plaintiffs' rights by taking no meaningful action to correct an intolerable situation of which they were both fully aware.

In assessing punitive damages against a defendant, the court must be mindful of the purpose of such an award. The awarding of punitive damages in appropriate cases serves as a deterrent to those abuses which Congress sought to prevent when it passed the LMRDA.

> Strong reasons of policy promote the use of exemplary damages to deter union officials from conduct designed to suppress the rights of members.... The very basis for the existence of unionism in our society today is the promise of employment to those who desire to associate freely in order to obtain it. The right of the working man to the benefits of collective bargaining is too essential and valuable to be hindered, impeded and seriously damaged by irresponsible and dictatorial leaders whose dominance in any given situation does great disservice to the purpose and principles of unionism.... Imposition of exemplary damages, when the requisite elements of malice, gross fraud, wanton or wicked conduct, violence or oppression are present, serves to achieve the deterrence they were designed to effect.

*Braswell*, 388 F.2d at 200, *quoting Fittipaldi v. Legassie*, 18 A.D.2d 331, 239 N.Y.2d 792, 796 (1963).

In deciding the proper amount of punitive damages to assess against the Union, this court specifically notes two important considerations. First, the defendants acted intentionally. Secondly, the court recognizes the individual union member's reluctance to challenge union business agents and other officers when the member's rights are violated because these officials exercise nearly complete control over the member's means of earning a livelihood. For all of the above reasons, the court assesses $120,000 in punitive damages to be paid by the Union, $10,000 to be paid to each plaintiff.[5]

This court also is very concerned with the role Babin has played in the events leading to the present causes of action and will play in Union affairs in the future. Babin had the authority and the duty to direct the actions of the other individual defendants in this case. The evidence shows he failed to properly supervise his business agents and failed to meaningfully investigate complaints received from union members. Babin remains the current Business Manager, and the testimony of Schiro and Mason indicates that Babin has not improved the quality of his supervision. Both Schiro and Mason testified that no one directly supervises their activities. Rather, they perform under an "honor" system. For these reasons, in addition to those discussed above, the court assesses punitive damages against Babin in the amount of $12,000, $1,000 to be paid to each plaintiff.

Both Carlock, Sr. and Laird were fired after the illegality of their activities came to light during FBI and Senate investigations. Subsequently, each was convicted

---

**5.** Johnson is entitled to recover punitive damages. By proving the Union violated his rights under the LMRDA, he established his *right* to compensatory damages. Although he failed to prove any compensatory damages, he may recover punitive damages to vindicate the invasion of his protected rights and as a deterrence against future violations. *Braswell*, 388 F.2d at 199. *Bise*, 618 F.2d at 1305.

and sentenced to prison for various crimes stemming from their operation of the Lake Charles district office. The court sees little prospect for their ever attaining positions of responsibility within the Union in the future. Because an assessment of punitive damages against these individuals would serve no useful purpose, the court will not now make such an assessment.

Finally, the plaintiffs seek recovery of reasonable attorneys' fees. Even "in the absence of statutory or contractual authorization, federal courts, in the exercise of their equitable powers, may award attorneys' fees when the interests of justice so require." *Hall v. Cole,* 412 U.S. 1, 4–5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973). Federal courts may award attorneys' fees to a successful party: (1) when his opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, or (2) where his successful litigation confers substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them. *Hall,* 412 U.S. at 5, 93 S.Ct. at 1946. The court finds an award of attorneys' fees justified under both theories.

The court has already found the Union, through its officers, acted in bad faith, wantonly and malicious. This conduct justifies shifting the burden of the plaintiffs' attorneys' fees to the Union.

The court also finds that by vindicating their own rights guaranteed by the LMRDA, the plaintiffs have rendered a substantial benefit to all members of the Union. This litigation has served to protect the rights of all Union members to be free from discrimination in the operation of the hiring hall by providing substantial deterrence from such conduct in the future. This litigation has also contributed to the preservation of union democracy by preserving the rights of all union to voice opposition to incumbent union officials without fear of reprisal. Because all Union members share in the benefits of this litigation, it is only fair that they share in its costs.

## CONCLUSION

For the reasons assigned above, the court rules in favor of plaintiffs. The court will render separate judgments in each of these actions reflecting its findings in this litigation.

## APPENDIX

1. November 30, 1981—Carl Beaugh was referred to Mar-Len Construction Co. for a one week job that lasted 235 hours. Beaugh signed the out-of-work list November 23, 1981 and jumped:

| | |
|---|---|
| Reed | October 6, 1980 |
| R. Edwards | November 23, 1981 |

2. December 4, 1981—Mike Duplechain was referred to IMC to operate a cherry picker one week. The job lasted 480.9 hours. He signed the out-of-work list December 2, 1981 and jumped:

| | |
|---|---|
| Reed | October 6, 1980 |
| R. Edwards | November 23, 1981 |
| C. Edwards | December 1, 1981 |
| Hatch | December 1, 1981 |

3. December 10, 1981—David George was referred to Bechtel for a 3–4 day job that lasted 802.75 hours. He signed the out-of-work list December 8, 1981 and jumped:

| | |
|---|---|
| Reed | October 6, 1980 |
| R. Edwards | November 23, 1981 |
| C. Edwards | December 1, 1981 |
| Hatch | December 1, 1981 |
| Johnson | December 8, 1981 |

4. January 5, 1982—Carl McNabb was referred to J.A. Jones as a master mechanic for a job lasting 1974.5 hours. He had not signed the out-of-work list and jumped:

| | |
|---|---|
| Reed | October 6, 1980 |
| R. Edwards | November 23, 1981 |
| C. Edwards | December 1, 1981 |
| Johnson | December 8, 1981 |
| Taliaferro | December 8, 1981 |
| Rowsey | December 10, 1981 |
| Guidry | December 15, 1981 |
| Romero | December 17, 1981 |
| Janise | December 17, 1981 |

5. February 8, 1982—Edward Kemp was referred to ECI for a 1–2 day job that lasted 319 hours. He signed the out-

of-work list December 22, 1981 and jumped:

| | |
|---|---|
| Reed | October 6, 1980 |
| R. Edwards | November 23, 1981 |
| C. Edwards | December 1, 1981 |
| Johnson | December 8, 1981 |
| Taliaferro | December 8, 1981 |
| Rowsey | December 10, 1981 |
| Guidry | December 15, 1981 |
| Romero | December 17, 1981 |
| Janise | December 17, 1981 |

6. December 10, 1981—Wyatt Trahan was referred to Industrial Construction Co. to operate a cherry picker for the duration of the job, which lasted over 4000 hours. He signed the out-of-work list December 10, 1981 and jumped:

| | |
|---|---|
| Reed | October 6, 1980 |
| R. Edwards | November 23, 1981 |
| C. Edwards | December 1, 1981 |
| Johnson | December 8, 1981 |
| Taliaferro | December 8, 1981 |

7. February 15, 1982—Howard Wash was referred to ECI Engineering Co. as a grease foreman for a 2 to 3 day job that lasted 400.5 hours. He signed the out-of-work list on January 28, 1982 and jumped:

| | |
|---|---|
| Reed | October 6, 1980 |
| R. Edwards | November 23, 1981 |
| Johnson | December 8, 1981 |
| Taliaferro | December 8, 1981 |
| Rowsey | December 10, 1981 |
| Guidry | December 15, 1981 |
| Janise | December 17, 1981 |
| Hatch | January 22, 1982 |

8. February 15, 1982—Clyde Shearin was referred to ECI Engineering Co. for a job that lasted 197 hours. He signed the out-of-work list January 28, 1982 and jumped:

| | |
|---|---|
| Reed | October 6, 1980 |
| R. Edwards | November 23, 1981 |
| Johnson | December 8, 1981 |
| Taliaferro | December 8, 1981 |
| Rowsey | December 10, 1981 |
| Guidry | December 15, 1981 |
| Janise | December 17, 1981 |
| Hatch | January 22, 1982 |

9. February 22, 1982—Carl Beaugh was referred to American Fabricators to operate a cherry picker for one week. The job lasted 217 hours. He signed the out-of-work list January 11, 1982 and jumped:

| | |
|---|---|
| Reed | October 6, 1981 |
| R. Edwards | November 23, 1981 |
| Johnson | December 8, 1981 |
| Taliaferro | December 8, 1981 |
| Rowsey | December 10, 1981 |
| Guidry | December 15, 1981 |
| Janise | December 17, 1981 |

10. April 2, 1982—Andy Chicano was referred to ECI Engineering as a heavy duty operator for the duration of the job, which lasted 190.5 hours. He signed the out-of-work list March 15, 1982 and jumped:

| | |
|---|---|
| R. Edwards | November 23, 1981 |
| Johnson | December 8, 1981 |
| Rowsey | December 10, 1981 |
| Hatch | January 23, 1982 |
| Janise | March 9, 1982 |
| Creel | March 15, 1982 |

11. April 19, 1982—Clyde Shearin was referred to J.A. Jones as a master mechanic for a one month job which lasted 792 hours. He had originally signed the out-of-work list December 8, 1981 and was removed when he worked from February 1982 to April 1982. He should have returned to the list at April 16, 1982. He jumped:

| | |
|---|---|
| Johnson | December 8, 1981 |
| Rowsey | December 10, 1981 |
| Hatch | January 23, 1982 |
| Creel | March 15, 1982 |
| Reed | March 16, 1982 |

12. April 26, 1982—Howard Wash was referred to IMC to operate a cherry picker for the duration of the job, which lasted for 215 hours. He signed the out-of-work list April 16, 1982 and jumped:

| | |
|---|---|
| Johnson | December 8, 1981 |
| Rowsey | December 10, 1981 |
| Hatch | January 23, 1982 |
| Creel | March 15, 1982 |
| Reed | March 16, 1982 |

13. May 10, 1982—Mike Duplechain was referred to Vincent Construction as a unit operator for a one week job which lasted 695 hours. He signed the out-of-work list April 5, 1982 and jumped:

| | |
|---|---|
| Johnson | December 8, 1981 |
| Rowsey | December 10, 1981 |
| Hatch | January 23, 1982 |
| Creel | March 15, 1982 |
| Reed | March 16, 1982 |

14. May 25, 1982—Carl Beaugh was referred to Augenstine to operate a cherry picker for a one day job which lasted 652 hours. He had originally signed the out-of-work list April 5, 1982 but his name should have gone to the bottom of the list because he worked two jobs, both of which lasted over 40 hours. He jumped:

| | |
|---|---|
| Johnson | December 8, 1981 |
| Rowsey | December 10, 1981 |
| Hatch | January 23, 1982 |
| Creel | March 15, 1982 |
| Reed | March 16, 1982 |
| C. Edwards | April 23, 1982 |
| Romero | May 11, 1982 |

15. May 26, 1982—David George was referred to SIPI to operate a cherry picker for a two to three week job which lasted 1178.25 hours. He signed the out-of-work list May 5, 1982 and jumped:

| | |
|---|---|
| Johnson | December 8, 1981 |
| Rowsey | December 10, 1981 |
| Hatch | January 23, 1982 |
| Creel | March 15, 1982 |
| Reed | March 16, 1982 |
| C. Edwards | April 23, 1982 |

16. June 8, 1982—Howard Wash was referred to White for a one to two week job. He signed the out-of-work list June 1, 1982 and jumped:

| | |
|---|---|
| Johnson | December 8, 1981 |
| Rowsey | December 10, 1981 |
| Hatch | January 23, 1982 |
| Creel | March 15, 1982 |

17. June 14, 1982—Winston Carlock was referred to J.A. Jones to operate a cherry picker for the duration of the job which lasted 108 hours. He signed the out-of-work list June 14, 1982 and jumped:

| | |
|---|---|
| Johnson | December 8, 1981 |
| Rowsey | December 10, 1981 |
| Hatch | January 23, 1982 |
| Creel | March 15, 1982 |
| Reed | March 16, 1982 |
| Romero | May 11, 1982 |

18. June 22, 1982—Howard Wash was referred to Sauer to operate a cherry picker for the duration of the job which 172 hours. He signed the out-of-work list June 14, 1982 and jumped:

| | |
|---|---|
| Johnson | December 8, 1981 |
| Rowsey | December 10, 1981 |

| | |
|---|---|
| Hatch | January 23, 1982 |
| Creel | March 15, 1982 |
| Reed | March 16, 1982 |
| Romero | May 11, 1982 |

19. July 28, 1982—Howard Wash was referred to Riggers as a mechanic for a one week job which lasted 60 hours. He had not signed the out-of-work list and jumped:

| | |
|---|---|
| Johnson | December 8, 1981 |
| Rowsey | December 10, 1981 |
| Creel | March 15, 1982 |
| Reed | March 16, 1982 |
| Romero | May 11, 1982 |
| C. Edwards | July 20, 1982 |

20. July 28, 1982—Edward Kemp was referred to Ford, Bacon & Davis to operate a cherry picker for a two week job which lasted 134 hours. He had not signed the out-of-work list and jumped:

| | |
|---|---|
| Johnson | December 8, 1981 |
| Rowsey | December 10, 1981 |
| Creel | March 15, 1982 |
| Reed | March 16, 1982 |
| Romero | May 11, 1982 |

21. August, 1982—Grady Cauthron was referred to Reading & Bates, where he worked 533 hours. He signed the out-of-work list July 2, 1982 and jumped:

| | |
|---|---|
| Johnson | December 8, 1981 |
| Rowsey | December 10, 1981 |
| Creel | March 15, 1982 |
| Reed | March 16, 1982 |
| Romero | May 11, 1982 |

22. August, 1982—Mike Duplechain was referred to Reading & Bates and worked 343 hours. He had not signed the out-of-work list and jumped:

| | |
|---|---|
| Johnson | December 8, 1981 |
| Rowsey | December 10, 1981 |
| Creel | March 15, 1982 |
| Reed | March 16, 1982 |
| Romero | May 11, 1982 |
| C. Edwards | August 17, 1982 |

23. August 24, 1982—Linda Young was referred to Sauer to operate a cherrypicker for a two day job which lasted 1012 hours. She signed the out-of-work list July 6, 1982 and jumped:

| | |
|---|---|
| Johnson | December 8, 1981 |
| Rowsey | December 10, 1981 |
| Creel | March 15, 1982 |
| Reed | March 16, 1982 |
| Romero | May 11, 1982 |

24. August 25, 1982—Winston Carlock was referred to Prepakt to operate a grout pump for one to two weeks. The job lasted 61 hours. Carlock had not signed the out-of-work list and jumped:

| | |
|---|---|
| Johnson | December 8, 1981 |
| Rowsey | December 10, 1981 |
| Creel | March 15, 1982 |
| Reed | March 16, 1982 |
| Romero | May 11, 1982 |
| C. Edwards | August 17, 1982 |

25. September 2, 1982—Edward Kemp was referred to Andreco to operate a fork lift for one day. The job lasted 416.5 hours. Kemp had not signed the out-of-work list. He jumped:

| | |
|---|---|
| Johnson | December 8, 1981 |
| Rowsey | December 10, 1981 |
| Creel | March 15, 1982 |
| Reed | March 16, 1982 |
| Romero | May 11, 1982 |
| Janise | August 26, 1982 |
| Hatch | August 27, 1982 |

26. September 8, 1982—Clyde Shearin was referred to Process Piping as a master mechanic on a job which lasted 144 hours. He had not signed the out-of-work list and he jumped:

| | |
|---|---|
| Rowsey | December 10, 1981 |
| Creel | March 15, 1982 |
| Reed | March 16, 1982 |
| Romero | May 11, 1982 |
| Janise | August 26, 1982 |
| Hatch | August 27, 1982 |

27. September 20, 1982—Howard Wash was referred to Process Piping as a master mechanic for a two to three day job which lasted 762.5 hours. He had not signed the out-of-work list and jumped:

| | |
|---|---|
| Johnson | December 8, 1981 |
| Creel | March 15, 1982 |
| Romero | May 11, 1982 |
| Janise | August 26, 1982 |

28. October 26, 1982—Clyde Shearin was referred to Marley Cooling Towers to operate a cherry picker for a one week job which lasted 272 hours. He signed the out-of-work list October 11, 1982 and jumped:

| | |
|---|---|
| Creel | March 15, 1982 |
| Janise | August 26, 1982 |
| Hatch | September 24, 1982 |

| | |
|---|---|
| Rowsey | September 28, 1982 |
| Reed | October 4, 1982 |

29. December 6, 1982—Carl McNabb was referred to Industrial Construction Co. for a two to three day job as a unit operator. The job lasted 411 hours. He signed the out-of-work list December 2, 1982 and jumped:

| | |
|---|---|
| Creel | March 15, 1982 |
| Janise | August 26, 1982 |
| Hatch | September 24, 1982 |
| Rowsey | September 28, 1982 |
| Reed | October 4, 1982 |
| C. Edwards | October 12, 1982 |
| Taliaferro | October 12, 1982 |
| Romero | November 2, 1982 |
| Guidry | November 9, 1982 |
| R. Edwards | November 15, 1982 |

30. January 7, 1983—Clyde Shearin was referred to Jacobs and Wiese as a master mechanic on a job which lasted 957 hours. He signed the out-of-work list December 15, 1982 and jumped:

| | |
|---|---|
| Creel | March 15, 1982 |
| Janise | August 26, 1982 |
| Hatch | September 24, 1982 |
| Rowsey | September 28, 1982 |
| C. Edwards | October 12, 1982 |
| Taliaferro | October 12, 1982 |
| Romero | November 2, 1982 |
| Guidry | November 9, 1982 |
| R. Edwards | November 15, 1982 |

31. January 11, 1983—Winston Carlock was referred to Jacobs and Wiese to operate a cherry picker for a one to two day job which lasted 326 hours. He had not signed the out-of-work list and jumped:

| | |
|---|---|
| Creel | March 15, 1982 |
| Janise | August 26, 1982 |
| Hatch | September 24, 1982 |
| Rowsey | September 28, 1982 |
| C. Edwards | October 12, 1982 |
| Taliaferro | October 12, 1982 |
| Romero | November 2, 1982 |
| Guidry | November 9, 1982 |
| R. Edwards | November 15, 1982 |

32. January 17, 1983—David George was referred to WEBCO as a relief operator for one to two days. The job lasted 196 hours. He had not signed the out-of-work list and jumped:

| | |
|---|---|
| Creel | March 15, 1982 |
| Janise | August 26, 1982 |
| Rowsey | September 28, 1982 |
| C. Edwards | October 12, 1982 |

Taliaferro    October 12, 1982
Romero       November 2, 1982
Guidry       November 9, 1982
R. Edwards   November 15, 1982

33. January 25, 1983—Edward Kemp was referred to Nicholls Construction Co. to operate a cherry picker for a one to day job which lasted 115 hours. He had not signed the out-of-work list. He jumped:

Creel        March 15, 1982
Janise       August 26, 1982
Rowsey       September 28, 1982
C. Edwards   October 12, 1982
Taliaferro   October 12, 1982
Romero       November 2, 1982
Guidry       November 9, 1982
R. Edwards   November 15, 1982

34. January 26, 1983—Andy Chicano was referred to NADCO as a mechanic for one to two days. The job lasted 1257 hours. Chicano signed the out-of-work list January 18, 1983 and jumped:

Creel        March 15, 1982
Janise       August 26, 1982
Rowsey       September 28, 1982
Taliaferro   October 12, 1982
Romero       November 2, 1982
Guidry       November 9, 1982
R. Edwards   November 15, 1982

35. February 6, 1983—Houston Byrd was referred to SIPI to operate a cherry picker on a two to three day job which lasted 289.5 hours. He signed the out-of-work list October 11, 1982 and jumped:

Creel        March 15, 1982
Janise       August 26, 1982
Rowsey       September 28, 1982

36. February 10, 1983—Carl McNabb was referred to NADCO to operate a cherry picker for a one to two day job which lasted 471 hours. He signed the out-of-work list February 9, 1983 and jumped:

Janise       August 26, 1982
Rowsey       September 28, 1982
Taliaferro   October 12, 1982
Romero       November 2, 1982
Guidry       November 9, 1982
R. Edwards   November 15, 1982

37. February 15, 1983—Howard Wash was referred to Jacob & Wiese to operate a backhoe for a one-day job which lasted 272 hours. He signed the out-of-work list February 9, 1983 and jumped:

Janise       August 26, 1982
Rowsey       September 28, 1982
Taliaferro   October 12, 1982
Romero       November 2, 1982
Guidry       November 9, 1982
R. Edwards   November 15, 1982

38. March 1, 1983—Edward Kemp was referred to Petro-Chemical to operate a cherry picker on a two to three day job which lasted 56 hours. He had not signed the out-of-work list and he jumped:

Janise       August 26, 1982
Rowsey       September 28, 1982
Taliaferro   October 12, 1982
Romero       November 2, 1982
Guidry       November 9, 1982
R. Edwards   November 15, 1982

39. March 1, 1983—Melvin Duplechain was referred to Petro-Chemical to operate a cherry picker for a two to three day job which lasted 377 hours. He signed the out-of-work list September 9, 1982 and jumped:

Janise       August 26, 1982

40. March 4, 1983—Mike Duplechain was referred to Nichols to operate a crane for a three to four day job which lasted 207 hours. He had not signed the out-of-work list and jumped:

Janise       August 26, 1982
Rowsey       September 28, 1982
Taliaferro   October 12, 1982
Romero       November 2, 1982
Guidry       November 9, 1982
R. Edwards   November 15, 1982

41. March 4, 1983—Grady Cauthron was referred to Nichols as a master mechanic for a four-week job. He signed the pipeline out-of-work list February 7, 1983 and jumped:

Taliaferro   October 13, 1982
Romero       November 2, 1982
Guidry       November 9, 1982
R. Edwards   November 15, 1982

42. March 7, 1983—Howard Wash was referred to NADCO as a master mechanic for a one to two day job which lasted 222.5 hours. He signed the out-of-work list March 2, 1983 and jumped:

Janise       August 26, 1982
Rowsey       September 28, 1982

Taliaferro   October 12, 1982
Romero   November 2, 1982
Guidry   November 9, 1982
R. Edwards   November 15, 1982

43. March 11, 1983—Edward Kemp was referred to Vincent Construction Co. as a cherry picker operator for a one to two day job which lasted 103 hours. He had not signed the out-of-work list and he jumped:

Janise   August 26, 1982
Rowsey   September 28, 1982
Taliaferro   October 12, 1982
Romero   November 2, 1982
Guidry   November 9, 1982
R. Edwards   November 15, 1983

44. March 21, 1983—Elmer Grantham was referred to Dolphin Construction Co. for the duration of the project and worked 496 hours. He signed the out-of-work list on March 19, 1983 and jumped:

Janise   August 26, 1982
Rowsey   September 28, 1982
Taliaferro   October 12, 1982
Romero   November 2, 1982
Guidry   November 9, 1982
R. Edwards   November 15, 1982

45. April 4, 1983—Willard Carlock, Jr. was referred to Industrial Construction Co. as a master mechanic and worked 226 hours. He signed the out-of-work list October 4, 1982 and jumped:

Janise   August 26, 1982
Rowsey   September 28, 1982

46. April 5, 1983—Linda Young was referred to Ellerbe Construction Co. and worked 928 hours. Her referral slip indicated employment by recall, but her employment records show she was ineligible for recall by Ellerbe, having last worked for this employer in May of 1982 for 52 hours. She signed the out-of-work list March 14, 1983 and jumped:

Janise   August 26, 1982
Rowsey   September 28, 1982
Taliaferro   October 12, 1982
Romero   November 2, 1982
Guidry   November 9, 1982
R. Edwards   November 15, 1982

47. April 19, 1983—Edward Kemp was referred to Dolphin Construction Co. to operate a dozer for the duration of the job which lasted 101.5 hours. He had not signed the out-of-work list and jumped:

Rowsey   September 28, 1982
Taliaferro   October 12, 1982
Romero   November 2, 1982
Guidry   November 9, 1982
R. Edwards   November 15, 1982
Hatch   March 16, 1983
Reed   March 17, 1983
Johnson   March 23, 1983
C. Edwards   April 4, 1983
Janise   April 15, 1983