Robert GUIDRY, Plaintiff–Appellee, Cross–Appellant,

v.

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 406, et al., Defendants–Appellants, Cross–Appellees.

No. 87–4733.

United States Court of Appeals, Fifth Circuit.

Aug. 29, 1989.

Rehearing and Rehearing En Banc Denied Sept. 28, 1989.

Robert H. Urann, Jerry L. Gardner, Jr., Metairie, La., for defendants-appellants cross-appellees.

Maurice L. Tynes, Lake Charles, La., for plaintiff-appellee cross-appellant.

Before RUBIN, GARZA and KING, Circuit Judges.

KING, Circuit Judge:

The plaintiff-appellee, Robert Guidry, sued the defendants-appellants, the International Union of Operating Engineers, Local 406 and former and current Union leaders, alleging denial of rights guaranteed by 29 U.S.C. § 411(a) (1985), unlawful discipline in violation of 29 U.S.C. § 529 (1985), and breach of the duty of fair representation. The United States District Court for the Western District of Louisiana found in favor of the plaintiff.[1] The court awarded damages for lost wages, emotional distress, punitive damages and attorneys' fees and ordered that Guidry be reinstated to Union membership. We affirm the judgment of liability, but we remand the award of damages for further findings.

## I. FACTS

The facts, as found by the district court, are summarized as follows:

## A. Background and Players

Plaintiff-appellee Robert Guidry ("Guidry") became a member of the International Union of Operating Engineers, Local 406 (the "Union") in 1949. The Union is a constituent division of the International Union of Operating Engineers and is an unincorporated labor organization with six districts in the state of Louisiana. There is. an office within each district, and the statewide central office is in New Orleans.

The Union elects a statewide Business Manager and Financial Secretary who works out of the central New Orleans Office. Defendant Peter Babin III ("Babin") has served in this position since 1976. The Business Manager negotiates collective bargaining agreements in Louisiana, serves on a committee that negotiates the National Pipe Line Agreement, acts as a trustee of the Union's Health and Welfare Fund, and appoints and supervises assistant business managers in the various districts who oversee the day-to-day functioning of the Union. These assistant business managers

are also known as "business agents" ("BAs") and they represent the Union at pre-job conferences, administer the hiring hall procedures, and appoint union stewards and master mechanics to act as representatives for the Union on the job.

Babin's predecessor as Business Manager appointed defendant Willard Carlock, Sr. ("Carlock") as BA for the Union's Lake Charles District. After he took office, Babin retained Carlock as BA until Carlock and his administration of the district came under criminal investigation. Babin fired Carlock on March 10, 1984. *Taliaferro v. Schiro*, 669 F.Supp. 763, 766 (W.D.La. 1987).

Babin appointed defendant Columbus J. Laird ("Laird") as BA for the Lake Charles District in 1978. Laird technically had as much authority as Carlock, but he considered Carlock his boss and followed Carlock's instructions. Laird was in office until January 15, 1985 when he resigned after an indictment was brought against him, Carlock, and others. *Id.*

Babin appointed Don Schiro ("Schiro") to be statewide Pipe Line Business Agent in March 1980. Schiro represented the Union in pipeline construction jobs controlled by the National Pipe Line Agreement and was responsible for attending pre-job conferences and appointing stewards and referring workers to pipeline jobs. However, Schiro generally left these details to BAs such as Carlock and Laird. *Id.*

The district court found that Babin's supervision of the BAs was "totally inadequate." *Id.* at 775–76. Upon appointing a BA, Babin instructed him to run the hiring hall on a non-discriminatory basis, but otherwise did very little to supervise him. He met with each BA semi-annually to discuss local problems. He had no formal evaluation procedure, but instead relied on his own re-election as evidence that Union members were satisfied with the performances of the BAs from their districts. *Id.* at 765.

1. The district court held trial on five related cases simultaneously and found for the plaintiff in each of the cases. *Taliaferro v. Schiro*, 669

F.Supp. 763 (W.D.La.1987). The defendants appeal the judgment in this case only.

### B. The Lake Charles District Hiring Hall

#### 1) *Generally*

The Union, as the exclusive collective bargaining agent for operating engineers in its jurisdiction, signed two major collective bargaining agreements. The first agreement is between the Union and the Lake Charles District, Associated General Contractors of Louisiana, Inc. and governs the building and construction industry (the "Building Trades Agreement"). The National Pipe Line Agreement covers all transportation mainline pipeline and underground cable work. Both agreements specify that the Union will provide labor through an exclusive hiring hall. The method for registering applicants for referral is set out in the agreements and involves placing individuals in four groups according to their work experience. The Union has always disregarded this rule and it has, instead, grouped workers together, keeping only a separate group for oilers. The hiring hall maintains two separate lists for building trades projects and pipeline projects, and, since March 1984, a worker can keep his or her name on only one list at a time. Both lists contain names in the order in which the applicant notifies the Union that he or she is available for work.

#### 2) *Departures from the Hiring Hall Procedure*

Both Agreements allow the contractor to hire some of its employees on any given job outside the structure of the hiring hall. The Building Trades Agreement allows the contractor to hire key personnel directly and to recall any worker who has been employed by that contractor for at least six of the previous twelve months. The National Pipe Line Agreement allows the contractor to hire half its workforce from a group of "regular employees." Regular employees have either been employed by the contractor in the prior six months or are customarily employed by that contractor whenever it has work. *Id.* at 767.

Additionally, the Union has developed informal departures from the regular hiring hall procedure of offering a referral to the first applicant on the list. The first of these exceptions is based on the fact that the Union can, according to the agreements, name stewards to pipeline projects and master mechanics to building trades jobs to act as Union representatives. The procedure for such appointment under the agreements is to name an individual from among the Union members already referred to the job. Carlock, Laird, and Schiro departed from this rule by naming stewards and master mechanics to jobs, regardless of their positions on the list. Schiro sometimes appointed individuals who were not yet even on the list to steward positions when the job they were working on at the time was nearing completion. *Id.* at 768.

Short-term jobs, which are expected to last one to three days, also were treated as exceptions to the hiring hall procedure. Referrals for these jobs were simply given to those applicants who were present at the Union hall at the time the referral was received, irrespective of the applicants' places on the list. Union leadership made a similar exception for temporary replacements of workers who were incapacitated or could not otherwise perform their jobs. *Id.* at 768.

Finally, the Union's collective bargaining agreement with Dolphin Construction Company required that the Union refer residents of Allen Parish to its construction project there. Allen Parish residents, therefore, received referrals to those jobs before non-residents whose names were higher on the list.

#### 3) *Manipulation of the Hiring Hall Procedures and the Exceptions*

The district court found that Carlock "exploited[ed] and, at times, disregard[ed] entirely the hiring hall procedures to enrich his confederates to the detriment of the plaintiff and others." *Id.* at 769. The district court went on to explain specifically the various ways in which Carlock accomplished this: (1) appointing his confederates as stewards or master mechanics irrespective of their skills or their places on the list; (2) abusing the short-term referral exception to designate some jobs as short-term that he knew to be substantially long-

er than three days; (3) allowing contractors to employ as "regular employees" workers who did not meet the requirements of that group as outlined in the National Pipe Line Agreement; (4) designating a referral as a recall under the Building Trades Agreement regardless of the individual's eligibility for recall. *Id.* at 769.

The district court found that Carlock quelled opposition by means of "intimidation and threats of retaliation in the form of economic discrimination and physical injury." *Id.* Also, the court found that Union members feared voting against Carlock because the balloting was not secret and they feared retaliation. *Id.* Finally, the court noted that Carlock made it difficult for disgruntled or suspicious workers to check their positions on the out-of-work list by keeping possession of, or control over, that list. *Id.* at 769–70.

## II. PROCEDURAL BACKGROUND

After a bench trial, the district court held in favor of the plaintiffs. The court awarded Guidry—who is the only plaintiff against whom this appeal is brought—lost wages totalling $5,310.50, $20,000 for emotional distress, $10,000 in punitive damages. The court also awarded attorneys' fees in an amount to be agreed to by the parties, or in default of that, to be set by the court. All of the above awarded damages were to be paid by the Union. The court also ordered the reinstatement of Guidry as a Union member. Additionally, the court awarded Guidry $1000 in punitive

damages to be paid by Babin. The defendants timely appealed the judgment of the district court, asserting that Guidry failed to prove liability and that the damage awards are improper or excessive. Guidry cross-appeals the amount of damages awarded for emotional distress, lost wages, and punitive damages—arguing that they are inadequate.

## III. THE QUESTIONS OF LIABILITY

The Union, Carlock, Babin, Schiro, and Laird (collectively the "defendants") argue on appeal that the district court erred in holding them liable under the Labor–Management Reporting and Disclosure Act, 29 U.S.C. §§ 401–531 (1985 and Supp. 1986) ("LMRDA"). The defendants also challenge the district court's conclusion that Union hiring hall procedures violated the duty of fair representation under the Labor Management Relations Act section 9(a), 29 U.S.C. § 159(a) (1973) ("LMRA"). Further, the defendants argue that Guidry failed to exhaust his internal union remedies, and therefore, his case should have been dismissed.

### A. The LMRDA Claim

Guidry argued below, and the district court found, that his rights under sections 101(a)(1), (2) of the LMRDA had been abridged, 29 U.S.C. §§ 411(a)(1), (2), and that he had been wrongfully disciplined under sections 101(a)(5) and 609, 29 U.S.C. §§ 411(a)(5)[2] and 529.[3] The court conclud-

---

**2.** Sections 411(a)(1), (2), and (5) read as follows:

(1) Equal Rights

Every member of a labor organization shall have equal rights and privileges within such an organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

(2) Freedom of Speech and Assembly

Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting,

subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

(5) Safeguards Against Improper Disciplinary Action

No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to

**3.** See note 3 on page 935.

ed that the defendants' manipulation of the hiring hall procedures to the detriment of Guidry and the other plaintiffs constituted violations of these provisions. It also concluded that Guidry's expulsion from the Union was violative of the LMRDA. The defendants assert that the evidence presented at trial does not support this portion of the verdict and that, therefore, the district court's factfinding is clearly erroneous for two reasons: (1) that there was no evidence to support the conclusion that Guidry exercised rights guaranteed him by the LMRDA, and (2) that there was no evidence to support the conclusion that the Union acted to retaliate against Guidry for having exercised those rights. Additionally, the defendants argue that even if the evidence supports the district court's underlying fact findings, its legal conclusion that the manipulation of hiring hall procedures constitutes "discipline" within the meaning of the statutes is erroneous. We address these arguments in order.

1) *Did Guidry Oppose Union Leadership?*

The district court found that "Guidry [had] a long history of opposing incumbent Union officers." 669 F.Supp. at 772. The defendants challenge this finding as clearly erroneous and unsupported by the evidence and assert that Guidry failed to show either that he actually opposed Union leadership or that his opposition of that leadership was known. They characterize the evidence as demonstrating that Guidry opposed the Union leadership only until 1972,[4] and as failing to show—aside from Guidry's own testimony that he had opposed every administration since 1956—that his opposition continued beyond 1972. The defendants cite *Chapa v. Local 18*, 737 F.2d 929, 932 (11th Cir.1984), for the proposition

that a plaintiff's "bald assertion" that he opposed union leadership and that the union retaliated is insufficient to support a verdict for the plaintiff on an LMRDA wrongful discipline claim.

We begin by noting that the defendants are urging us to review the district court's factfinding. Our review is limited by Federal Rule of Civil Procedure 52(a), which provides that we may not set aside such findings unless "clearly erroneous." This standard of review has been interpreted to mean:

> [that] [i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Anderson v. Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Applying this standard, we conclude that the district court's factfinding is not clearly erroneous. The defendants' characterization of the record is incomplete. Far from simply containing Guidry's conclusory assertions that he generally opposed Union management, the record contains Guidry's specific testimony of particular instances of his opposition to the Union.

Guidry described in detail the circumstances of his decision in 1979 to go to the Federal Bureau of Investigation ("FBI") with evidence of Union corruption. Guidry made that decision after discussing his position with fellow Union members. Guidry testified that when Carlock and Laird discovered that he had gone to the FBI, they came on the job site at which Guidry was

---

**3.** See note 3 on page 935.prepare his defense; (C) afforded a full and fair hearing.
Section 101, 29 U.S.C. Sec. 411, is often referred to as the union members' "Bill of Rights."

**3.** Section 529 ("Prohibition on certain discipline by labor organization") reads as follows:
It shall be unlawful for any labor organization or any officer, agent, shop steward, or

other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter. The provisions of section 412 of this title shall be applicable in the enforcement of this section.

**4.** It is clear from the evidence that the last time Guidry ran for Union office was in 1972.

employed as master mechanic and sought to force his employer to discharge him. Guidry ultimately filed charges against Carlock with the Union's executive board. Although these events occurred outside the one-year prescriptive period applicable to Guidry's LMRDA claim, *see infra* at section IV.A, they are not too remote in time to have been found by the district court to have triggered Union retaliation.

Guidry's testimony is replete with examples of challenges he levelled against the Union leadership's operation of the hiring hall. These include a challenge to the hiring methods on a job for which he was asked to steward—Guidry openly complained that men who had never worked for the company before were hired as "regular employees." Guidry also challenged the hiring hall when he discovered that his name had been left off the out-of-work list as a result of a new rule that required him to choose between the building trades and the pipeline lists.

According to Guidry's testimony, as well as that of Union members, Guidry's opposition to the Union leadership was hardly a secret. Charles Lovett, a member of the Union who was called to testify for the plaintiffs, noted that Guidry had been "bucking the system" at the Union for twenty-five years and had gained nothing.

■ The Union challenges this testimony as inadequate because it fails to show that Guidry either sought a Union office after 1972 or openly campaigned against the Union leadership in an election after 1972. The defendants argue that all of Guidry's political activity in the Union is too remote in time to support a claim of retaliation occurring in 1980–83. The flaw in the defendants' argument is their assumption that in order to assert a violation of section 101(a)(2) of the LMRDA, a plaintiff must show that he or she spoke out in opposition to Union leadership in the context of an election. We read the statute to contain a much broader protection of speech.

The statute itself speaks of the right of every union member to "express any views, arguments or opinions," 29 U.S.C. § 411(a)(2), *supra* n. 2, and does not limit such expression to one occurring in the context of a union election. In fact, the statute refers separately to a union member's right to express his views upon candidates running for union office. *Id.*

The Supreme Court has characterized the LMRDA as "the product of congressional concern with widespread abuses of power by union leadership." *Finnegan v. Leu,* 456 U.S. 431, 435, 102 S.Ct. 1867, 1870, 72 L.Ed.2d 239 (1982). The "Bill of Rights" portion of that legislation was "aimed at enlarged protection for members of unions paralleling certain rights guaranteed by the Federal Constitution." *Id.* at 435, 102 S.Ct. at 1870. Congress "recognized that democracy would be assured only if union members are free to discuss union policies and criticize the leadership without fear of reprisal." *Sheet Metal Workers' Intern. Ass'n v. Lynn,* —— U.S. ——, ——, 109 S.Ct. 639, 645, 102 L.Ed.2d 700 (1989) (quoting *United Steelworkers of Am. v. Sadlowski,* 457 U.S. 102, 112, 102 S.Ct. 2339, 2346, 72 L.Ed.2d 707 (1982)).

■ The defendants do not cite, nor have we found, any cases that limit the free speech rights protected by the LMRDA's Bill of Rights to speech relating directly to an election within the union. While we agree with the defendants' position that the evidence adduced at trial does not support the conclusion that Guidry formally opposed Union leadership after 1972 in the context of a Union election, we conclude that the district court was not clearly erroneous in its finding that Guidry openly opposed Union leadership at least up to the time that he filed this suit.

2) *Did the Union Act to Retaliate Against Guidry for Exercising Free Speech Rights?*

■ The district court found generally that hiring hall procedures were abused and threats of retaliation in the form of economic and physical injury were used to control Union members and to enrich those members who supported the leadership. 669 F.Supp. at 769. The court also enumerated the instances of such reprisals

that specifically related to Guidry. In addition to discrimination in the hiring hall, the district court found that the Union retaliated against Guidry for his opposition to leadership by denying him a gold Union membership card recognizing his thirty years of service. Also, the district court found that Union economic pressure forced Guidry to violate Union rules and cross a picket line. The court found that when Guidry faced charges for having crossed the picket line, Laird telephoned supporters of the leadership to ensure that they would attend the meeting at which the membership was to vote on Guidry's fate—thus, making his expulsion almost certain.

The defendants challenge these factfindings as clearly erroneous. They argue that even if Guidry did show that he had been discriminated against in hiring hall referrals, he failed to show that such discrimination was connected to his exercise of rights protected under the LMRDA. They argue that the other union acts found by the district court to have been discriminatory were justified by long-standing Union rules.

The record contains abundant evidence, both in the form of testimony and documentation, of the procedures followed by Union leadership in referring applicants to jobs through the hiring hall. The court found twenty-one specific instances in which Union leadership manipulated the hiring hall procedure by employing one of the means outlined above. This resulted in direct harm to Guidry. See Taliaferro, 669 F.Supp. at 781–86 (Appendix). The district court concluded that each improper referral had been used to penalize Guidry (and the other plaintiffs) for their refusal to support the defendants. Id. at 776.[5] We do not find clear error in this conclusion.

The defendants argue that Guidry failed to show in each case of hiring hall discrimi-

nation that the intent of Union leadership was discriminatory. We disagree. Guidry (and the other plaintiffs) provided substantial evidence, particularly in the testimony of Laird, of the attitude of Carlock toward those members who had "voted wrong" in prior elections, and of the control Carlock exercised over the out-of-work list. This evidence, coupled with the clear evidence of Guidry's dissent from Union leadership, is sufficient to support a conclusion that the discrimination was intentional. Even though the evidence is largely circumstantial, it is sufficient to support the verdict. See Vandeventer v. Local 513 of Int'l Union of Op. Eng., 579 F.2d 1373, 1380 (8th Cir.) (holding that primarily circumstantial evidence was sufficient to support verdict that union had taken retaliatory action), cert. denied, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978).

Additionally, the plaintiffs introduced testimony and exhibits regarding the specifics of each wrongful referral found by the district court. After reviewing the evidence supporting each of the twenty-one wrongful referrals, which involved jumping over Guidry's name on the out-of-work list, this court is convinced that the district court's factfinding is correct and supported by substantial evidence. We, therefore, do not disturb the district court's conclusion that discrimination in the hiring hall referrals took place and was used in retaliation for Guidry's failure to support Union leadership.

3) *Does the Manipulation of Hiring Hall Procedures Constitute Discipline within the Meaning of Sections 101(a)(5) and 609 of the LMRDA?*

 The defendants challenge the district court's holding that the wrongful hiring hall referrals constitute "discipline" within the meaning of sections 101(a)(5)

---

5. The district court also concluded that each improper refusal constituted a breach of the duty of fair representation under 29 U.S.C. § 159(a). 669 F.Supp. at 775–76. The defendants dispute this conclusion, solely on the ground that the evidence is insufficient to support the factfinding that intentional discrimination in hiring hall referrals had occurred. We

therefore conflate their arguments under the LMRDA and the duty of fair representation to the extent they concern the sufficiency of the evidence. That is, we address only once the issue of whether the finding that the operation of the hiring hall was intentionally discriminatory was clearly erroneous.

and 609 of the LMRDA, 29 U.S.C. §§ 411(a)(5) and 529. They argue that according to *Finnegan v. Leu, supra,* the term "discipline" in section 609 refers to actions taken by the union that diminish the membership rights of a union member. Hiring hall discrimination does not qualify, according to the defendants, because hiring hall referrals must be made available to non-union members. *United Ass'n of Journeymen, Local 198 v. NLRB,* 747 F.2d 326 (5th Cir.1984); National Labor Relations Act, § 8(b)(1)(A), (b)(2), 29 U.S.C. § 158(b)(1)(A), (b)(2).

The issue presented here—whether proof that a union has retaliated against one of its members for his exercise of a right protected under section 101 of the LMRDA constitutes "discipline" within the meaning of section 609 of that act—has been addressed by a number of courts with apparently contradictory results. We conclude, however, that the cases can be harmonized, and we hold that under the facts presented here, Guidry has made out a proper claim for wrongful discipline in violation of the LMRDA.

In *Miller v. Holden,* we held:

Union action which adversely affects a member is "discipline" only when (1) it is undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership, and (2) it directly penalizes him in a way which separates him from comparable members in good standing.

535 F.2d 912, 915 (5th Cir.1976). We decided that the claim brought in *Miller*—that the plaintiff's discharge from his employment by a trust established by, but separate from, his union—did not state a cause of action under the LMRDA because the discharge did not constitute "discipline" under the statute. In determining the meaning of discipline we looked first to the statute and its legislative history, *id.* at 914 n. 5 (citing 1 Legislative History of LMRDA of 1959, 338, 516, 619, 687, 858 (NLRB ed. 1959)), but concluded that neither was enlightening on the issue. We,

therefore, applied the principal of statutory construction of *ejusdem generis* and construed the general term discipline to conform to the essential character of the three specific types of discipline listed in the statute: fine, expulsion, and suspension. *Id.* at 914–15. Our result required, as quoted above, that the union action separate the plaintiff from other union members in good standing to constitute discipline.

We followed the holding in *Miller* to find that manipulation of hiring hall referrals to the detriment of the plaintiff constituted discipline within the meaning of LMRDA in *Keene v. International Union of Op. Eng., Local 624,* 569 F.2d 1375 (5th Cir. 1978). In that case, the plaintiff had unsuccessfully run for union office. He showed that after his loss in the election he received virtually no referrals through the union's hiring hall and that over two hundred people with less priority on the out-of-work list received referrals in preference to him. We held that a jury could reasonably conclude that such discrimination in referrals constituted discipline for exercising rights protected under the LMRDA.

The question, however, is not so easily resolved. The Supreme Court addressed the issue of what constitutes "discipline" under section 609 of the LMRDA in a different, but related, context in *Finnegan v. Leu, supra.* In that case, the plaintiffs sued under the LMRDA after they were discharged from their employment as union business agents following the election of Leu as president of the union. The plaintiffs had openly supported Leu's rival, the incumbent president, in the campaign. At trial, Leu explained that he had discharged the plaintiffs because he felt that they were loyal to the incumbent and would be unable to implement his policies. The Court held that the term discipline in section 609 "refers only to retaliatory actions that affect a union member's rights or status *as a member* of the union." 456 U.S. at 437, 102 S.Ct. at 1871 (emphasis added). It concluded that the discharge of the plaintiffs from their appointive union positions was not within the scope of "other discipline" contemplated by section 609. *Id.* at

439, 102 S.Ct. at 1872.[6] The Court reasoned that the LMRDA was intended to protect rank-and-file union members, rather than union officers or employees. Therefore, while the plaintiffs' right to campaign against a candidate for union president was protected, such campaigning did not immunize them from discharge at the pleasure of the new president from their jobs as union employees.

In cases not involving the loss of employment within the union itself, an apparent conflict in interpreting *Finnegan* has arisen. In *Hackenburg v. International Bhd. of Boilermakers, Local 101*, 694 F.2d 1237 (10th Cir.1982), the court followed *Finnegan* to hold that union members who were "benched"—that is they received no referrals—following a wildcat strike had not been "otherwise disciplined" within the meaning of the LMRDA.

In *Hackenburg*, the union, following the terms of its collective bargaining agreement with an employer, deprived the plaintiffs of any job assignments for ninety days as a result of their involvement in a wildcat strike. The plaintiffs sued, arguing that they had been "otherwise disciplined" within section 101(a)(5) of the LMRDA, 29 U.S.C. § 411(a)(5), without the procedural protections afforded by that section. The court determined that the "sanctions imposed were employment related rather than internal union related," 694 F.2d at 1240, and, relying on *Finnegan*, held that the procedural safeguards of section 101(a)(5) were not available because the punishment was not related to the union members' rights or status as members. *Id.* at 1239.

*Turner v. Local Lodge # 455 of the Int'l Bhd. of Boilermakers*, 755 F.2d 866 (11th Cir.1985), involves circumstances very similar to those in *Hackenburg*. The plaintiffs in *Turner* also suffered a ninety-day benching pursuant to the terms of a collective bargaining agreement as a result of their refusal to cross an illegal picket line. The court first noted that the plaintiffs' contention that the benching had actually occurred in retaliation for their exercise of rights protected by sections 101(a)(1) and (2) of the LMRDA had been properly taken away from the jury because of the lack of evidentiary support. It then addressed the plaintiffs' contention—which was identical to that in *Hackenburg*—that the benching had violated section 101(a)(5) because proper procedures had not been followed before the union imposed the sanction.

The court considered the broad language in section 101(a)(5) and stated that "the sweeping language ... cannot be read out of context, but must be taken as backing and support for union members exercising their 'Bill of Rights' and that any union disciplinary measure unrelated to the 'Bill of Rights' is not covered." *Turner*, 755 F.2d at 869. Therefore, the absence of any claim of retaliation by the union was fatal to the plaintiffs' LMRDA claim. The court then went on to state that under the inter-

---

The Court went on to address the question of whether section 102 of the LMRDA, 29 U.S.C. § 412, provided independent authority for the suit. Section 102 provides that:

> Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate.

The Court noted that the intended relationship between this provision and section 609 was "not entirely clear," 456 U.S. at 439, 102 S.Ct. at 1872, but indicated that a litigant could maintain an action under section 102 without necessarily stating a violation of section 609. However, it concluded that in the circumstances before it no "rights secured" by the subchapter had been infringed, holding that whatever limits the sub-

chapter placed on the union's authority to use dismissal to suppress dissent, it did not restrict union leaders from choosing a staff with views compatible with their own. *Id.* at 440–41, 102 S.Ct. at 1872–73. In *Sheet Metal Workers' Inter. Ass'n v. Lynn*, —— U.S. ——, 109 S.Ct. 639, 102 L.Ed.2d 700 (1989), the Court recently limited this portion of the holding in *Finnegan* to cases in which the union employment was appointive, rather than elective. The Court reasoned in *Lynn* that when an elective official is removed from his post, the union members are denied their chosen representative, and the chilling effect on free speech is more widespread. *Id.* 109 S.Ct. at 645.

Because we find that a violation of section 609 has occurred here, it is clear that this suit could also be maintained under section 102. That does not, however, affect the result here.

pretation of "discipline" found in *Finnegan*, the benching in the case before it did not constitute discipline, because it did not affect the plaintiffs' rights as members of the union in as much as union membership is not a requirement in order for one to be carried on the out-of-work list and receive employment referrals. *Id.* In concluding, however, the court noted that "the case might be different" if there had been evidence of, for example, "retaliation for exercise of a protected right." *Id.* at 870.

Such a different result was reached by the Sixth Circuit in *Murphy v. International Union of Op. Eng., Local 18,* 774 F.2d 114 (6th Cir.1985), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1201, 89 L.Ed.2d 315 (1986), in which the court found that a denial of work assignments through a hiring hall to a union member in retaliation for his opposition of union leadership could be considered "discipline" within the meaning of section 101(a)(5). *Murphy,* 774 F.2d at 122. The court went on to uphold the district court's conclusion that although the union's actions were not "discipline," they were nevertheless actionable as violative of sections 101(a)(1) and (2). The court distinguished *Finnegan* on the ground that the *Finnegan* court had been concerned with union employees and the right of a union leader to choose people to help him run the union. *Id.* at 123. The court stated: "Plainly, the Supreme Court in *Finnegan* did not intend to rule out [29 U.S.C.] section 411 as a protection against manipulative discrimination on behalf of an ordinary union member seeking to exercise his right of expression at union meetings." *Id.* The court also distinguished *Turner* and *Hackenburg* simply by noting that the unions involved in both had acted pursuant to collective bargaining agreements. *Id.* at 122 n. 5. The court did not address the question of whether the language in *Turner,* which states that a refusal to refer a member to employment does not affect his rights as a member, 755 F.2d at 869, precluded a determination that such a refusal could constitute discipline in any circumstances.

In *Moore v. Local 569 of the Int'l Bhd. of Elec. Workers,* 653 F.Supp. 767 (S.D.Cal.

1987), the court directly addressed the problem avoided in *Murphy*—that *Turner* appears to preclude a holding that discriminatory referral procedures affect union members' *rights* as a member of the union. The court began by analyzing the reasoning in the problematic dicta from *Turner* that because non-members could take advantage of a union hiring hall, membership rights are not affected by a discriminatory hiring hall. *Moore,* 653 F.Supp. at 770. The *Moore* court decided that this language did not preclude a determination that membership rights were ever affected by such discrimination for two reasons. First, the court inferred that in *Turner,* the plaintiffs no longer had a right to be referred to work because of their involvement in wildcat strikes prohibited under the collective bargaining agreement. *Id.* Second, and more importantly, the court reasoned that one of the rights of a union member was to receive nondiscriminatory referrals from the union hiring hall. The court concluded that the ability of non-members to place their names on the out-of-work list did not diminish and, in fact, had no relationship to that right. The court, therefore, rejected the union's contention in the case before it that the dicta in *Turner* regarding the issue of whether benching could constitute discipline should control. It found instead that the plaintiffs' allegations stated a cause of action under section 609 of the LMRDA. *Id.* at 770–71.

We agree with the *Moore* court's rejection of this dicta from *Turner* in circumstances such as those before us. It is apparent from the evidence that Guidry's name was repeatedly skipped over on the out-of-work list in retaliation for his outspoken opposition to Union leadership. Here, as in *Murphy,* and as distinguished from *Turner* and *Hackenburg,* there was evidence of a reprisal for exercise of rights protected under the LMRDA. The *Turner* court itself noted that if there is evidence of union retaliation the case might be different. We also point out that here, as distinguished from *Finnegan,* the question involves the right to fair treatment of a union member by his union. In *Finnegan,*

the plaintiffs were seeking to retain their employment by the union, not something to which every union member is entitled. Here, on the other hand, the plaintiff simply seeks not to be singled out for unfair treatment by his union. We simply cannot agree with the defendants' contention that the discriminatory administration of the hiring hall does not represent the kind of discipline covered by the LMRDA.

## B. Exhaustion of Union Remedies

The defendants challenge the district court's ruling on the ground that Guidry failed to exhaust his internal union remedies, and, as a result, they argue that his suit should have been dismissed. In his complaint, as well as on brief to this court, Guidry asserts that pursuit of his internal union remedies would have been futile, and therefore, he is not required to exhaust that avenue before filing this suit. The district court did not directly address this question, although it clearly did not find that Guidry's failure to exhaust internal union remedies precluded this suit.

Section 101(a)(4) of the LMRDA, 29 U.S.C. § 411(a)(4), allows courts in their discretion to require that a union member exhaust his internal remedies before filing suit. *See* 29 U.S.C. § 411(a)(4); *Hammons v. Adams*, 783 F.2d 597, 603 (5th Cir.1986); *Chadwick v. International Bhd. of Elec. Workers, Local 175*, 674 F.2d 939 (D.C.Cir. 1982).

■ Before a union member may bring suit against his union for breach of the duty of fair representation under section 301 of the LMRA, 29 U.S.C. § 185, the member must either exhaust union remedies or show an adequate reason for not doing so. *Clayton v. International Union*, 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981). Here too, courts have discretion to decide whether to require such exhaustion. *Id.* at 689, 101 S.Ct. at 2095. Factors relevant to the inquiry of whether to require exhaustion are: (1) whether union officials are so hostile to the member that he cannot hope to obtain a fair hearing; (2) whether the union procedures are adequate; and (3) whether re-

quiring exhaustion would unreasonably delay the member in pursuing his rights. *Id.* Guidry asserts that the first of these exceptions is applicable here.

■ The Union Constitution and By-laws, admitted into evidence in the court below, provide simply that the local union's determination of any grievance shall be final and binding. Neither provides specific grievance procedures for the type of complaint Guidry asserts. In such absence of procedural requirements, an employee may proceed to file suit after pursuing his contractual remedies. *Hammons*, 783 F.2d at 602. Additionally, where it is clear, as here, that because the complaint is directed at those officials who would hear Guidry's complaint, the member should be excused for his failure to exhaust internal remedies. *Hayes v. Brotherhood of Ry. and Airline Clerks/Allied Servs. Div.*, 734 F.2d 219 (5th Cir.), *cert. denied*, 469 U.S. 935, 105 S.Ct. 336, 83 L.Ed.2d 272 (1984).

## IV. THE DAMAGE AWARDS

### A. The Statute of Limitations

■ The district court, following *Local 1397, United Steelworkers of Am. v. United Steelworkers of Am.*, 748 F.2d 180 (3d Cir.1984), applied a six-month statute of limitations to the plaintiffs' LMRDA claims. It therefore looked back six months prior to the date of filing of the suit to determine the amount of damages. After the district court rendered its decision, and after oral argument on this case, the Supreme Court overruled *Local 1397*. *Reed v. United Transp. Union*, — U.S. —, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989). The Court held in *Reed* that, unlike claims brought under section 301 of the LMRA, *see DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), claims brought under section 101(a)(2) of the LMRDA are more akin to civil rights claims than to unfair labor practice charges. Therefore, the Court reasoned under the rule established in *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), the state general or residual personal injury statute of

limitation should apply to actions brought under section 101(a)(2). Therefore, we look to Louisiana state law to determine the appropriate statute of limitations for the LMRDA claims. The claims under section 301 of the LMRA are, however, still subject to the six-month limitation.

■ Article 3492 of the Louisiana Civil Code provides a one-year limitations period for delictual actions, which include personal injury actions. La.Civ.Code Ann. art. 3492 (West Supp.1989). Therefore, the limitations period that should be applied to Guidry's claims under the LMRDA is one year.[7] Because the damages amount must be based in part on facts not found by the district court, we must remand the damages portion of this cause for a redetermination of the amount of damages to be awarded. However, we can and will address the legal issues raised by the parties regarding the types of damages awarded.

### 1) Punitive Damages

The district court awarded punitive damages to be paid both by the Union and Babin, relying on *International Bhd. of Boilermakers v. Braswell*, 388 F.2d 193, 199 (5th Cir.), *cert. denied*, 391 U.S. 935, 88 S.Ct. 1848, 20 L.Ed.2d 854 (1968), and *Parker v. Local Union No. 1466, United Steelworkers of Am.*, 642 F.2d 104, 106 (5th Cir.1981), for the proposition that punitive damages may be awarded under the LMRDA where the union acted with "actual malice or reckless or wanton indifference to the rights of the plaintiff." *Braswell*, 388 F.2d at 199.

On appeal, the defendants urge us to overrule this Circuit's precedent and rule that punitive damages are unavailable in LMRDA cases. Alternatively, they argue that the evidence does not support the finding of malice on which the punitive damage award depends. We find neither argument convincing.

As to the first argument, we simply point out that as a panel of this court, we are not free to overrule the precedent of prior Fifth Circuit cases. Only the *en banc* court has the necessary power to do so. *National Bank of Commerce of Dallas v. All American Assurance Co.*, 583 F.2d 1295, 1301 (5th Cir.1978). As to the defendants' second argument, we point to our discussion *supra* at parts IIIA. 1 and 2 of the sufficiency of the evidence. We conclude that the evidence adduced at trial supports the district court's finding of malice, and therefore we uphold the court's decision to award punitive damages, al-

---

7. A subsidiary issue is whether *Reed* should be afforded retroactive effect in this case. We believe that it should.

The general rule is that federal cases should be decided according to the law existing at the time of the decision. *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). In *Chevron Oil Co. v. Huson*, 404 U.S. 97, 105–09, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), however, the Supreme Court declined to apply retroactively a limitations period that would have time barred a litigant's lawsuit. The Court refined a three-part nonretroactivity test: (1) the supervening decision must establish an unforeseen and unforeshadowed principle of law, as where the Court has overruled clear circuit precedent on which the litigants may have relied; (2) the purposes of the substantive law upon which the limitations period operates would not be served by retroactivity; and (3) retroactive application would produce inequitable results. *Id.* at 106–07, 92 S.Ct. at 355–56. These factors provide no basis for refusing retroactive application of *Reed* to this case.

Prior to *DelCostello*, the established precedent in the Fifth Circuit specified application of an appropriate state statute of limitations in section 101(a)(2) cases. *Sewell v. Grand Lodge of Int'l Ass'n of Machinists & Aerospace Workers*, 445 F.2d 545, 548–50 (5th Cir.1971), *cert. denied*, 404 U.S. 1024, 92 S.Ct. 674, 30 L.Ed.2d 674 (1972) (applying a one-year Alabama statute of limitations for tort actions). No post-*DelCostello* Fifth Circuit decision definitively altered this rule until the district court below adopted the Third Circuit's *Local 1397* interpretation of a six-month limitations period. Thus, *Chevron*'s first factor clearly is not satisfied: Fifth Circuit precedent was not overruled by, but in fact supported, the *Reed* decision; at most, the limitations issue was unsettled after *DelCostello*. Likewise, the remaining two *Chevron* factors cannot be met. Applying Louisiana's one-year limitations period to determine damages in this case would further the remedial goals of section 101(a)(2) of the LMRDA without substantially frustrating any federal policy of repose, and would not be inequitable, as litigants in this Circuit could not have justifiably relied on a six-month limitations period prior to *Reed*. *See Goodman*, 482 U.S. at 662–64, 107 S.Ct. at 2621–22.

though, for the reason noted below, we vacate the amount of the award.

On cross-appeal, Guidry argues that the amount of punitive damages awarded was insufficient and he seeks enhancement of the amount to $250,000. The only argument Guidry advances for this position asserts essentially that because the Union can afford more, this award is not sufficiently punitive. Because we remand this case for a redetermination of the damage award, we decline to address this issue. Because the district court may have been influenced in its decision on punitive damages by the amount of actual damages, we vacate the punitive damage award and leave it to the district court, in its discretion, to fix once again the amount of punitive damages when the amount of actual damages has been recomputed.

### 2) Emotional Distress

■ The defendants also contest the award of damages for emotional distress, arguing that because the plaintiffs failed to present evidence of any physical manifestations of that distress, such an award is unavailable under the LMRDA. We agree that emotional distress "standing alone does not constitute a sufficient basis for the awarding of damages under the [LMRDA]." *Bise v. International Bhd. of Elec. Workers, Local 1969*, 618 F.2d 1299 (9th Cir.1979) (quoting *International Bhd. of Boilermakers v. Rafferty*, 348 F.2d 307, 315 (9th Cir.1965)), *cert. denied*, 449 U.S. 904, 101 S.Ct. 279, 66 L.Ed.2d 136 (1980). In order to protect against spurious claims for emotional distress that might drain union coffers and thereby deprive other members of effective representation, some courts have required LMRDA claimants who seek damages for emotional distress also to adduce some evidence of actual injury. *See id.* Other courts do not impose an actual injury requirement. *Compare Bise, supra with Bradford v. Textile Workers of Am.*, 563 F.2d 1138, 1144 (4th Cir.1977). Whether to impose an actual injury requirement, as well as what such a

requirement entails, are issues of first impression for this Circuit.

We conclude, as the district court did, that LMRDA claimants who seek damages for emotional distress must adduce some evidence of actual injury. The environment in which LMRDA claims arise—discipline and termination by both unions and employers—is emotionally charged at the outset and, thus, one in which claims for emotional distress are likely to be the rule rather than the exception. Moreover, the subjective nature of these claims makes it particularly difficult to dismiss meritless actions at early stages in the litigation—before the union has gone to considerable expense in defending the action. Hence, we agree with the Ninth Circuit that an actual injury requirement should be imposed in order to protect unions in their representative capacities from malice from within.

■ A further issue to be resolved, however, is what type of evidence will suffice to establish "actual injury." Despite professed agreement, the two circuit courts that have addressed this problem construe "actual injury" in different ways. In *Rodonich v. House Wrecker's Union Local 95*, 817 F.2d 967, 977 (2d Cir.1987), the Second Circuit upheld the following jury instruction: "[y]ou must find such mental or emotional distress based upon the particular plaintiff's physical condition or medical evidence." *Id.* The Second Circuit then declared that "[t]he qualification that claims of emotional distress be supported by a physical manifestation of injury is an appropriate safeguard against the award of excessive and speculative damages." *Id.; see also Petramale v. Local 17, Laborers' Int'l Union of North Am.*, 847 F.2d 1009, 1012 (2d Cir.1988). The Ninth Circuit, however, construes "actual injury" more broadly. In *Bise* and its progeny,[8] lost wages, as well as physical manifestations of emotional distress, served as sufficient indication of actual injury. In the case before us, the district court awarded damages for emotional distress to those plaintiffs who could

---

8. *See, e.g., Bloom v. International Bhd. of Team-* *sters,* 752 F.2d 1312, 1315 (9th Cir.1984).

demonstrate actual injury through lost wages.

We adopt the Ninth Circuit's approach. We fail to see why physical manifestations of injury should be the sole guarantor of genuineness; financial distress may well be the most reliable and frequent cause of mental distress. Moreover, whatever the indicia of actual injury used, plaintiffs who seek damages for emotional distress must present credible evidence of that distress. District courts should not be hidebound to antiquated notions about the nature of mental injury and suffering in order to determine whether an LMRDA claim is genuine. We therefore affirm the district court's interpretation of the actual injury requirement. We vacate the award, however, for reconsideration along with the other components of damages to be awarded.

### 3) *Attorneys' Fees*

■ The district court awarded to Guidry and the other plaintiffs "reasonable" attorneys' fees. The court looked to *Hall v. Cole*, 412 U.S. 1, 4–5, 93 S.Ct. 1943, 1945–46, 36 L.Ed.2d 702 (1973) to determine the standards for an award of reasonable attorneys' fees. *Hall* allows an award of attorneys' fees to a successful party even in the absence of statutory or contractual authority when his opponent has acted in bad faith or when his success in the litigation confers a benefit on members of an ascertainable class, and where the court's award of attorneys' fees will make it possible to spread the cost of litigation over the class of beneficiaries of the suit. The court below held that, in this case, attorneys' fees were available under both theories.

On appeal, the defendants argue that the district court's application of these two theories was an error of law. We agree.

The bad faith exception to the general rule—that absent contractual or statutory authority, attorneys' fees are not recoverable—is set out in detail in *Shimman v. International Union of Op. Eng., Local 18*, 744 F.2d 1226, 1228–34 (6th Cir.1984) (en banc), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985). *Shim-*

*man* makes clear that the focus of the bad faith inquiry is not the actions that precipitated the law suit, but rather the manner in which the litigation itself is carried out. That is, the rule is intended to penalize the litigant who brings to court a frivolous suit or defense, or abuses the process so as to create an inquiry separate from the underlying claim. *Id.* at 1231. This court has adopted the same reasoning. *See, e.g., Batson v. Neal Spelce Assoc.*, 805 F.2d 546, 550 (5th Cir.1986).

There is no evidence that the defendants in this case have either brought a frivolous defense or pursued the litigation in a vexatious manner. For that reason, we disagree with the district court's holding that the bad faith exception is applicable here.

■ The common benefit theory is also unavailable to Guidry. The *Shimman* court discussed this theory as well. In *Shimman,* as in the instant case, the underlying litigation resulted in a damage award benefitting only the plaintiffs personally. The plaintiffs contended in *Shimman,* as they do here, that although the money awards do not benefit the union membership as a whole, an incidental benefit of the awards—dispelling the chill on free speech created by union leadership—does inure to the benefit of all union members.

The court in *Shimman* explicitly rejected this theory. 744 F.2d at 1235. The court reasoned that the idea of the common benefit theory is to shift the costs of litigation to those who would have had to pay if they had brought the suit. *Id.* In *Shimman,* as here, other members of the union could not have brought suit to redress the injuries of an individual union member. Further, an award of attorneys' fees here would not spread the costs of litigation proportionate to the common benefit. Guidry would have to pay no more for the cost of litigation than any fellow union member, but he would receive substantially greater benefits in the form of cash awards.

We therefore hold that on remand, the district court should not include an award of attorneys' fees in its damages award.

#### 4) *Lost Wages*

Guidry argues in his cross-appeal that the amount of lost wages awarded was inadequate to compensate him. Once again, we are not in a position to review the district court's damage determination because we are remanding that portion of the holding. We note, however, that the district court's method of determining the lost wages due—comparing Guidry's actual wages to the average amount earned by union members during the limitations period—is a sound and fair method of making that determination.

#### V.

For all the foregoing reasons, we AFFIRM the judgment as to the defendants' liability, and we VACATE the award of damages and REMAND for redetermination of the proper amount. Costs shall be borne by the defendants.